UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
                                     )       CRIMINAL NO. 2:17-cr-00077
                  v.               )
                                       )
JOHN CHINNICI )

## SUPPLEMENTAL MEMORANDUM IN SUPPORT
## OF DEFENDANT'S RULE 33 MOTION FOR NEW TRIAL

NOW COMES Defendant John Chinnici, by and through his attorney, David J. Williams, and hereby supplements his Rule 33 motion for a new trial based on information developed since December 2018 when he filed that motion.[1]

In addition, this supplemental memorandum raises a claim of prosecutorial misconduct that was not included in Defendant's Motion for a New Trial. The second Hemmings Motor News surveillance video that was not introduced at trial and Det. Cole's notes taken while he watched that video demonstrate that Austin Mayhew lied when he testified that shortly after midnight on January 11, 2016, he and John Chinnici left his apartment together and walked east on Main Street toward downtown Bennington hoping to find someone to rob.

Because the prosecutor eliciting this testimony prosecutor knew or should have known that Mayhew was not telling truth and made no effort to correct the record, Defendant's right to due process of law was violated. For that reason, the Court must vacate the verdict and order a new trial. *Napue v. Illinois,* 360 U.S. 264 (1959) (a criminal conviction obtained through the use of false evidence, known by representatives

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

---

[1] Counsel has prepared a detailed Chronology of Events in this case. *See Appendix A.*

of the government, violates due process of law); *Giglio v. United States*, 405 U.S. 150, 153 (1972) ("deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with 'rudimentary demands of justice'").

1. **Bennington Police Department's practices regarding the custody and preservation of evidence in criminal cases**

During trial, the Court learned that the Bennington Police Department (BPD) had lost track of three cell phones - one voluntarily surrendered by John Chinnici and two seized from Austin Mayhew and Vanessa Garcia. In January 2019, two of the cell phones were purportedly discovered in a drawer in an unused desk in the BPD's detectives' room.

During his testimony at trial, Det. Cole provided the following description of how the BPD secured evidence in criminal investigations:

> So at the Bennington Police Department, when an officer comes into possession of evidence relating to an investigation that they're doing, the responsible officer would take whatever evidence that is, create an evidence sheet, and they would place two copies of the evidence sheet in the temporary evidence room. One copy goes on a clipboard that's attached to the wall inside the temporary evidence room; the other evidence sheet is placed inside a bag, whether it be plastic or paper, and then that bag is sealed. And there's also an entry made into the evidence control book. And at a later time, it's my responsibility to take all officers' evidence and move it from temporary evidence into what we call deep evidence. And at the Bennington Police Department, there are only two people that have access, have keys to deep evidence, which is myself and Detective Silvestro. *Trial transcript, Vol. 3, pp. 86-87.*

At the February 7, 2019 status conference, the Court observed that the two phones seized at the Mayhew/Garcia residence "couldn't have come out of the evidence room without being logged. So somebody – some – unless they really aren't following procedures … I can't imagine a police department giving back property without showing

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

something going into evidence and coming out of evidence and some record of how it's going to be disposed of." *Ex. 48, pp. 5-6.*[2]

In an effort to discover how the department kept track of evidence in criminal cases, the defense had requested a copy of the BPD's policies and procedures for the storage and retention of evidence. *Ex. 49, ¶ 3.* In response to this request, Det. Cole informed the United States Attorney's office that "there is no Bennington PD policy regarding the storage and retention of evidence in criminal cases." *Id.*

Counsel also requested a copy of the official entry log for the so-called "Deep Evidence" room at the BPD. *Ex. 49, ¶ 2.* In response, Det. Cole indicated that "there is no such thing as an official entry log and such a log has never existed." *Id.*

Responding to a different discovery request by counsel, the government produced a copy of the BPD's "Temporary Evidence Control Log." *Ex. 50.* The log requires officers to sign the log and note which items are placed in and out of Temporary Evidence and the case number with which the items are associated. *Id.*

As described below in greater detail, the three missing cell phones were placed in and removed from the Temporary Evidence room at the BPD, and many of these transactions were not documented.

Following the February 7, 2019 status conference, the defense requested every chain of custody document related to the three missing cell phones. *Ex. 51, ¶¶ 7 and 8.* This request yielded additional BPD Property Reports indicating that evidence was

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

---

[2] The exhibit numbers 1 through 47 refer to the original exhibits submitted to the Court in December 2018. Exhibits 48 through 105 refer to additional exhibits submitted with this pleading.

removed from Temporary Evidence without being logged out and returned without being logged back in on the Temporary Evidence Control Log.

Had the following facts been developed before trial and presented to the jury by defense counsel, together with all of the other exculpatory evidence that was never presented, there is a reasonable likelihood that the jury would have concluded that the government's allegations would not have been proven beyond a reasonable doubt.

### 2. The disappearance of John Chinnici's cell phone

Following the February 7, 2019 status conference, counsel requested any and all chain of custody documents related to John Chinnici's missing Samsung cell phone that was surrendered to BPD's Det. Cole on January 14, 2016. *Ex. 51, p. 1, ¶ 7.*

A comparison of the documents produced before trial and those produced in response to the February 2019 request reveals that two of Det. Cole's emails related to the disappearance of John Chinnici's cell phone were not produced before trial. One of the emails was sent by Det. Cole to Deputy State's Attorney Plunkett on December 1, 2017; the other was sent to Assistant United States Attorney Barbara Masterson on December 4, 2017. *Ex. 52, pp. 10 -11 and p. 12.*

The government was unable to provide any additional chain-of-custody documents related to the missing Samsung cell phone. The only BPD Property Report for John Chinnici's Samsung phone indicates that Det. Cole placed the phone into Temporary Evidence on January 14, 2016. *Ex. 52, p. 15.* There are no BPD chain-of-custody documents corroborating any of the various assertions Det. Cole made in the documents produced either before or after trial, or his trial testimony. *Ex. 52.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

The witness statements produced before and after trial show how Det. Cole's

story about the Chinnci phone evolved over time:

10/26/16 – ATF Agent Sam Brown sends an email to Det. Cole requesting transfer of the phone to ATF; *Ex. 52, p. 2.*

10/27/16 – Det. Cole sends email to Deputy State's Attorney Plunkett telling him "[w]e have John Chinnci's phone here at BPD" and that ATF wants to search the phone. Cole asks Plunkett if he has "[a]ny thoughts." *Ex. 52, p. 3.*

12/5/16 – Det. Cole sends email to Det. Silvestro asking Silvestro "Didn't you already turn his cell phone over to ATF?", adding "Bear with me ---my mind is clouded------" *Ex. 52, p. 4.*

9/5/17, 12:19:13 p.m. – ATF Agent Brown sends email to Det. Cole advising Cole that the Chinnci case has been officially transferred to the federal government, and tells Cole "I will need to take possession of all property in BPD custody related to the Chinnci case ASAP." *Ex. 52, p. 5.*

9/5/17, 3:54 p.m.  – Det. Cole sends email to Agent Brown advising Brown that John Chinnci's personal property was returned to his father on January 14, 2016 and that the "cell phone taken from Chinnci was turned over to ATF for examination many months ago. I have no record of that phone being returned to BPD." *Ex. 52, p. 6.*

11/22/17 – Deputy State's Attorney Plunkett alerts Det. Cole that John Chinnci has filed a motion to return his cell phone and asks Cole to "give me what you can." *Ex. 52, p. 7.*

12/1/17, 7:00 a.m. – Det. Cole sends an email to Deputy State's Attorney Plunkett indicating what he remembers about the handling of John Chinnci's phone, i.e., he gave it to Silvestro to search, Silvestro returned it to him, and he transferred the phone to ATF with the caveat that he has "no documentation to support the transfer."

In this email, Cole indicates that "ATF and I searched EVERY officer's Evidence Container here at BPD in the hope that the phone had been placed in the wrong container. The phone was not found. I searched all the Safekeeping containers for the phone. The phone was not found."

"Our standard procedure is to place evidence in the Temporary Evidence Room and then at another time, the evidence is placed in the Deep Evidence Room … When ATF and I went through each box [in the Deep Evidence Room], we tried to look at each and every cell [phone] being held as evidence and did not find the Chinnci phone." *Ex. 52, pp. 10-11.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

12/1/17, 8:26 a.m. – Det. Cole sends an email to unknown recipients indicating that he has a "vague memory of the phone being mailed so they could do their own extraction… And do you have a problem with my forwarding this email to Barb Masterson, or should I just send the affidavit that you put together?" *Ex. 52, p. 9.*

12/1/17, 9:28 a.m. – Det. Cole sends email to Deputy State's Attorney Plunkett, telling him that Silvestro's extraction report had been sent to ATF and that the extraction "was of little help to the actual investigation." Cole continued: "Between you and I, do you see ATF NOT wanting to do their own extractions? I seem to remember that they thought they could work their magic doing it their way, doing their own extraction." *Ex. 52, p. 8.*

12/6/17 – Det. Cole executes an affidavit indicating that he recalls that "ATF wanted to examine the phone using their own methods. I believe I handed the phone to them. However, I have no documentation to support my memory. ATF says they never had the phone in their possession, only the extraction completed by Detective Silvestro." *Ex. 52, p. 18.*

At trial, Det. Silvestro testified he conducted logical and file system extractions of John Chinnici's cell phone, which was unlocked and not password-protected, using software developed by Cellebrite. *Trial transcript, Vol. 3, pp. 125-130.* Det. Silvestro further testified that the logical and file system extractions he used to examine John Chinnici's phone do not have the capacity to download data from third-party applications like Facebook Messenger. *Trial transcript, Vol. 3, p. 119.*

The limitations of the logical and file extractions used by Det. Silvestro may explain why Det. Cole was reluctant to transfer custody of John Chinnici's Samsung cell phone to ATF in October 2016 and his subsequent inconsistent statements about what happened to that phone.

### a. A possible explanation for the disappearance of John Chinnici's cell phone

John Chinnici downloaded Facebook's Messenger application to his Samsung phone and used that application to communicate with other people who also used the

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Messenger application. *Ex. 70.* In pretrial discovery, the government provided the defense with screenshots of text messages John Chinnici exchanged with Trisha Farkas on January 8, 2016. *Ex. 53.* At trial, Trisha Farkas testified that she and John Chinnici communicated using Facebook's Messenger application. *Trial transcript, Vol. 3, p. 57.* Screenshots of Facebook Messenger communications that were on Trish Farkas' phone, between Trisha Farkas and John Chinnici, were admitted at trial. *Ex. 53(c), 11A and 11C; Trial transcript, pp. 58, 67-68.* When John Chinnici's phone went missing, so did potential exculpatory evidence of his Messenger conversations that transpired during the time he was alleged to have been committing the robbery.

The Hemmings Motor News surveillance video recorded between midnight and 1:00 a.m. on January 11, 2016 (but not shown to the jury by either party) conclusively demonstrates that John Chinnici was not with Austin Mayhew when Mayhew left his apartment to commit the robbery. (Hemmings Motor News surveillance video, midnight to 1 a.m., 1/11/16). *Ex. 43.* The video also conclusively demonstrates that Mayhew lied to Det. Cole on January 14, 2016, to investigators on March 16, 2016, to the grand jury on August 2, 2017, and at trial when he falsely claimed that he and John Chinnici left his apartment together and walked east on Main Street while on their way downtown. *See Ex. 24, p. 11, Ex. 44, ¶ 7, Ex. 45, p. 17,* and *Trial transcript, Vol. 2, pp. 126-128.*

Det. Cole knew that Mayhew made up this story because the Hemmings surveillance video he reviewed on January 12, 2016 showed no such thing.[3] *See Ex. 1*

---

[3] Det. Cole viewed the surveillance video and took notes as he watched the video. *Ex. 54.* Det. Cole's notes indicate that an unidentified person unlocks Vanessa Garcia's vehicle in the driveway next to the Garcia/Mayhew apartment at 12:08:55 a.m., January 11, 2016. The unidentified person then sits in the vehicle for about three-and-a-half minutes before the vehicle backs out of the driveway around 12:12:20 a.m. Det. Cole's notes indicate that the vehicle then stopped twice on Main St., first at 12:12:44 a.m., and

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

(Det. Cole's Narrative Report) and *Ex. 54* (Det. Cole's notes re: Hemmings surveillance video). Cole knew that the video showed a lone person leave the apartment around 12:08 a.m., and get into Vanessa's car which backed out of the driveway a few minutes later. *Ex. 54* (Det. Cole's notes re: Hemmings surveillance video).

If John Chinnici was not with Austin Mayhew when Mayhew left his apartment to commit the robbery, what was John doing? On January 10, 2016, at 9:22:49 p.m., John Chinnici sent Stephanie Dockery a text message that he was heading "[b]ack to Bennington! I gotta stop by to see a buddy but not until 12." *Ex. 53(a), Item 1530.* A few minutes later, John Chinnici sends text messages to Stephanie Dockery using Facebook Messenger. *Ex. 53(a), Items 1513 and 1515.*

At 11:58:12 p.m., John Chinnici sends a text message to Stephanie Dockery, telling her "I gotta go right now. I'll be back in a little bit." *Ex. 53(a), Item 1504.* A few minutes later, John Chinnici tells Stephanie: "I'll text you in like 15-20 but please send me more pics …" *Ex. 56(a), Item 1500.* At 11:58:09 a.m., John Chinnici sends three texts with the same message: "Gotta go right now!" *Ex. 53(a), Items 496-498.*

After he left to visit his buddy, John Chinnici exchanged messages with Ashley Raleigh and Stephanie Dockery using Facebook Messenger between midnight and 1 p.m.

---

the second time at 12:13:04: am. The second time the vehicle stopped, someone opened the right rear door and thereafter the vehicle continued west on Main St. at 12:13:24 a.m. *Ex. 54.*

Det. Cole's notes indicate that the Garcia vehicle returns to the driveway next to the Garcia/Mayhew apartment about 43 minutes later and shows one person exiting the vehicle. No one is seen leaving the apartment building and walking east towards Hemmings, which must be passed to reach Martin's Mobil, which is located several blocks further to the east. *Ex. 54.*

Det. Cole's notes also contradict Mayhew's trial testimony that John Chinnici returned to Mayhew's Main Street apartment around 2 a.m. According to Mayhew, he and John Chinnici split up shortly after the robbery and went their separate ways. *Ex. 54; Trial transcript, Vol. 2, pp. 136-138.*

JARVIS, McARTHUR
& WILLIAMS

ATTORNEYS AT LAW

UITE 2E – PARK PLAZA

95 ST. PAUL STREET

P. O. BOX 902

BURLINGTON, VT

05402-0902

802–658–9411

Ex. 55 (Affidavit of Ashley Raleigh) *and Ex. 55(a)* (Bennington Police Traffic Accident Report, 1/10/16, 10:55 p.m. involving David and Ashley Raleigh's vehicle).[4] Those text messages that would have been stored in the Facebook Messenger application on John Chinnici's cell phone.

With exclusive access to John's phone, which was not password-protected[5], and after learning from Trisha Farkas that John used Facebook Messenger to communicate with his friends, the BPD had every reason (and the Vermont Superior Court's permission) to check out any messages stored on John's Facebook Messenger app.

Discovery provided by the government on March 21, 2019 shows that Det. Cole had his own Facebook account and that he used Facebook Messenger to communicate with others, including Austin Mayhew. *Ex. 56(a).*

The messages stored in John Chinnici's Facebook Messenger provided proof (in addition to the Hemmings surveillance video) that John was not with Mayhew when Mayhew and another person committed the robbery. This additional proof, however, was not going to get in the way of Det. Cole's effort to pin the robbery on John Chinnici.[6]

---

[4] A government trial exhibit demonstrates that earlier that evening, John Chinnici was sending Stephanie Dockery text messages using Facebook Messenger. *See 53(b), Government Trial Ex. 21H, Conversation 04.*

John Chinnici's text message to Stephanie Dockery asking "Did you get my message on Messenger?" was introduced at trial when Det. Silvestro testified. *Trial transcript, Vol. 3, p. 153.*

[5] Det. Silvestro testified at trial: "The cell phone was unlocked. It was open. There was no password." *Trial transcript, Vol. 3, p. 127.*

[6] For example, the evidence demonstrates that Det. Cole intentionally misled the Vermont Superior Court in his application for the warrant to search John Chinnici's phone by failing to tell the judge that the Hemmings surveillance video directly contradicted Austin Mayhew's false claim that he and John Chinnici left Mayhew's apartment together to commit the robbery. *Ex. 30.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

Det. Cole knew that the Cellebrite extraction did not capture the exculpatory Facebook Messenger messages that showed that John was not with Mayhew during the robbery. Det. Cole's reaction to ATF Agent Sam Brown's October 26, 2016 request to transfer John's cell phone to that agency is reflected in his subsequent attempts to misled Agent Brown. Cole certainly was aware that if he sent the phone to ATF, sooner or later someone would discover John's Facebook Messenger communications with Ashley and Stephanie, and realize that John was not with Mayhew when Mayhew and someone else committed the armed robbery.

There was one way to make sure that ATF did not find the exculpatory Facebook Messenger messages. The BPD could lose the phone. That is why, in a message sent just a few weeks after he told Deputy State's Attorney Plunkett on October 27, 2016 that "[w]e have John Chinnici's phone here at BPD," *Ex. 52, p. 3*, Cole feigned confusion in an email to Det. Silvestro: "Didn't you already turn his cell phone over to ATF? ... Bear with me ---my mind is clouded------" *Ex. 52, p. 4.*[7]

In September 2017, when Agent Brown informed Det. Cole that his agency needed "to take possession of all property in BPD custody related to the Chinnici case," Cole tried to mislead Agent Brown, telling Brown that the "cell phone taken from Chinnici was turned over to ATF for examination many months ago. I have no record of that phone being returned to BPD." *Ex. 52, p. 6.*

---

[7] Before his Samsung phone was seized by Det. Cole, John Chinnici did not delete any of his Facebook Messenger texts. After Det. Cole seized his cell phone, John Chinnici did not ask or authorize anyone to delete his Facebook Messenger texts. When he asked counsel to look for those messages in his Messenger application, those messages had been deleted. *Ex. 70.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

10

In a December 1, 2017 email related to John Chinnici's motion to return property, Det. Cole claimed that he had "a vague memory of the phone being mailed [to ATF so they could do their own extraction." *Ex. 52, p. 9.* In an affidavit executed five days later, the method of delivery changed and Det. Cole told the court that he "believe[d] [he] handed the phone to them." *Ex. 52, p. 18.*

The suspicious and unaccounted-for disappearance of John Chinnici's phone from the BPD's evidence room, the fact that the phone contained exculpatory text messages that Det. Cole was certainly aware of, and Det. Cole's dissembling after he was asked to transfer the phone to ATF in October 2016 suggests that Det. Cole intentionally destroyed exculpatory evidence. *See Arizona v. Youngblood*, 485 U.S. 903 (1988).

Based on the recent disclosure of Det. Cole's statements, the government's earlier failure to provide these statements before trial in violation of the Court Pretrial Order, Ashley Raleigh's statement that she was exchanging text messages with John Chinnici while Austin Mayhew and someone else committed the robbery, and the police accident report that corroborates her statement, the Court should vacate the guilty verdict and order a new trial.

3. **The two missing cell phones belonging to Austin Mayhew and Vanessa Garcia, originally seized by the Bennington Police Department on January 14, 2016 under the authority of a state court search warrant**

a. **Evidence available to the defense *before* trial**[8]

---

[8] Because Mr. Chinnici was first charged with assault and robbery by the Bennington County State's Attorney's Office in January 2016, that office provided discovery to Mr. Chinnici's court-appointed attorneys who were representing him in state court until the state charges were dismissed.

Subsequently, the United States Attorney's Office provided discovery to Attorney Bud Allen who was appointed by this Court pursuant to the Criminal Justice Act.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

On January 14, 2016, at 6:28 a.m., BPD officers executed a search warrant at Austin Mayhew's and Vanessa Garcia's apartment located at 214 Main St., Bennington, Vermont. *Ex. 6 and Ex. 7.* During the search, the police seized two blue and black flip phones belonging to Mayhew and Garcia. *Ex. 8.*

The Bennington Police Department Property Report produced by the United States Attorney's Office in pretrial discovery on July 11, 2018 indicates that the two flip phones were placed into temporary evidence by Officer Murawski at 0910 hours on January 14, 2016, *Ex. 50,* and were transferred to the "deep evidence" room on January 21, 2016 at 10:25 a.m. *Ex. 57.* At trial, Bennington Police Detective Lawrence Cole testified that only he and Detective Silvestro had keys to the "deep evidence" room. *Trial transcript, Vol. 3, p. 87.*

As the trial approached, defense counsel asked the United States Attorney's Office whether data had been downloaded from the Mayhew/Garcia phones. Perhaps in response to this discovery request, the prosecutor sent Det. Cole this email:

> I believe you seized Austin Mayhew's and Vanessa Garcia's phones on January 14, 2016, when you executed the search warrant at their residence. I do not have a copy of the Cellebrite reports for the extraction of these phones. I assume that was done. WILL YOU PLEASE CALL ME, NOT EMAIL, and tell me the status of those reports? *Ex. 59.*[9]

On July 2, 2018, the prosecutor sent defense counsel the following cryptic message related to the Mayhew/Garcia phones:

---

Documents without Bates stamped numbers were produced by the Bennington County State's Attorney's Office while the state criminal case was pending. Documents with Bates page numbers were produced by the United States Attorney's Office.

[9] Defense counsel did not make a written request for data downloaded from the two phones; it is not clear why it took so long for defense counsel to request this data. Masterson to Williams, 4/5/19, *Ex. 58.*

12

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

In response to your discovery request for the contents of the phones used by Austin Mayhew and Vanessa Garcia, I asked Larry Cole of Bennington PD if he caused an extraction of those phones to be done. He did not, and nor does he have those phones ... *Ex. 60.*

The fact that the phones were now declared lost was extremely problematic.

Perhaps for that reason, on July 11, 2019 the United States Attorney's Office provided defense counsel with "additional documents received from the Bennington Police Department." *Ex. 61.* Among the newly disclosed documents were:

1. A BPD Property report indicating that the phones, together with other evidence sized at the Mayhew/Garcia apartment during the search were placed into temporary evidence at 0910 hours on January 14, 2016, *Ex. 62*, Bates 1929-1930 (Notation in upper left-hand box indicates that the property was taken into custody as evidence);

2. A BPD Property report indicating that the phones (described as blue and black flip phones), together with other evidence sized at the Mayhew/Garcia apartment during the search were transferred from temporary custody into "Evidence" at 10:25 on January 21, 2016. A notation on the second page of the form indicates that 25 Temazepam tablets were "Put in pill collection container in lobby of P.D." on January 25, 2018. *Ex. 57*, Bates 2064-2065;

3. A written statement prepared by Austin Mayhew on January 3, 2016 indicating that his phone number was 802-430-1327. *Ex. 63.* Bates 1964-1965;

4. A Sworn Recorded Statement signed by Austin Mayhew on January 14, 2016 indicates that his phone number was 802-430-2833. *Ex. 64.* Bates 2006.[10]

On July 19, 2018, the United States Attorney's office provided, apparently for the first time, copies of the Mayhew/Garcia search warrant package for their residence. *Ex. 65.*[11] After receiving this discovery, defense counsel apparently did not request any

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

---

[10] It is unclear why the United States Attorney's Office waited until the eve of trial to disclose these critical documents to defense counsel, or why defense counsel had not requested these documents earlier.

[11] It is unclear why the United States Attorney's office waited until four days before trial to disclose critical documents that had been in the possession of ATF since August 2016, or why defense counsel had not requested these documents earlier. *See Ex. 66.*

further discovery or try to find out what may have happened to the Mayhew/Garcia phones. After all, the last version of the BPD Property Reports provided *before trial* indicates that the two phones were still in the so-called "Deep Evidence" room, having been transferred to that room by Det. Cole on January 21, 2016 at 10:25 a.m. *Ex. 57.*

    While Det. Cole was testifying at trial, the Court learned that the BPD had lost track of Mr. Chinnici's phone and the two cell phones seized at the Mayhew/Garcia apartment. Other than telling the Court that Det. Cole turned the evidence room upside down looking for them, the prosecutor offered no explanation for the phones' disappearance or what happened to those phones after they were seized by the BPD. *Trial Transcript, Vol. 3, pp. 94-106.*

### i.    Defense counsel questions Scott Galusha at trial

    Before trial, defense counsel did not subpoena the AT&T call records for the accounts for the two "lost" cell phones seized by the BPD on January 14, 2016. Obtaining these records would not have been that difficult. Defense counsel knew the name of the cell service provider (AT&T) and, based on discovery provided by the United States Attorney's office, he easily could have figured out the numbers assigned to those cell phones. *See Ex. 64* (Mayhew Sworn Statement, Bates 2006) and *Ex. 67* (Vanessa Garcia Arrest Custody Report).[12]

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

---

[12] Copies of these documents were provided to defense counsel on July 11, 2018. *Ex. 62(a).* The Mayhew Sworn Statement form indicates his phone number was 802-430-2833. The Arrest Custody Report indicates that Vanessa Garcia's telephone number was 802-430-1327.

Right after the robbery, some suspected that the robbery was an "inside job," planned and executed by Mayhew and Galusha.[13] In addition, John Chinnici told defense counsel that Mayhew received a call from Galusha around 9:00 a.m. on January 11, 2016, just a few hours after the robbery. *Ex. 70.* The Hemmings Motor News video the government introduced at trial shows that Defendant and Mayhew were together buying coffee a few minutes before 9:00 a.m. on January 11, 2016.

While cross-examining Galusha at trial, defense counsel tried to develop the theory that Galusha and Mayhew were partners in the crime. Defense counsel established that Galusha was dating Austin Mayhew's sister. Defense counsel then asked Galusha whether he spoke by phone with Austin Mayhew on January 11, 2016. Galusha testified that he did not. *Trial transcript, Vol. 2, p. 60.* Without the data from the Mayhew and Garcia phones or the AT&T call records, defense counsel hit a dead end and was unable to undermine Galusha's denial that he and Mayhew were in contact by phone after the robbery.

---

[13] On May 17, 2018, Galusha's employer, David Dupee, told the prosecutor and ATF Agent Brown that he "suspected that Galusha was involved in the January 2016 robbery and that problems at the store (i.e., multiple burglaries) began shortly after Galusha had been hired." *Ex. 69.*

On May 26, 2016, ATF Agent Samuel Brown interviewed Scott Galusha at the apartment he shared with Austin Mayhew's sister, Joslin Mayhew. In his report, Agent Brown noted that Galusha had been convicted in federal court of bank robbery and that he was the last person to leave Martin's Mobil on November 19, 2015 just before the store was burglarized, a burglary in which Austin Mayhew was the chief suspect[13]. *Ex. 69(a).*

During the interview, Galusha told Agent Brown that law enforcement suspected that he had given Mayhew information about "the layout of the store," i.e., where the money stolen during November 19, 2015 break-in was hidden, and that he had told Mayhew when the store was closing on January 11, 2016 to facilitate the robbery. Galusha, however, steadfastly denied such conduct. *Ex. 69(a)*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

15

b.  **Evidence developed *after* trial**

(i)     **Where were the phones kept after they were seized on January 14, 2016?**

In January 2019, the United States Attorney's Office informed defense counsel that the BPD had found the cell phones seized at the Mayhew/Garcia apartment. On February 7, 2019, the prosecutor told the Court that the Bennington Police found the phones in "a vacant desk drawer in Detective Cole's – in the detective room at the Bennington Police department," apparently left there by an officer who was supposed to return the two phones to Mayhew and Garcia. *Ex. 48, p. 5.* After this rather curious disclosure, the following exchange occurred:

> THE COURT: But they have -- they couldn't have come out of the evidence room without being logged. So somebody -- some -- unless they really aren't following procedures. The phone comes out because she erroneously thinks the case is over, and she is going to return them to their owners. Where is the record of them coming out of evidence?
>
> MS. MASTERSON: I don't have that with me, your Honor. And I don't know the answer.
>
> THE COURT: Does it exist?
>
> MS. MASTERSON: I hope so.
>
> THE COURT: I mean, you -- I can't imagine a police department giving back property without showing something going into evidence and coming out of evidence and some record of how it's going to be disposed of.
>
> MS. MASTERSON: I do recall Detective Cole telling me that there were notations on the paperwork that these individuals, Vanessa and Austin, had been contacted. So I am extrapolating from that that there is paperwork that reflects the removal from the evidence vault.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

THE COURT: All right … *Ex. 48, pp. 5-6*.

In light of this new disclosure, the defense requested all chain of custody documents related to the two cell phones seized at the Mayhew/Garcia apartment on January 14, 2016. *Ex. 51*, ¶ 8. The additional documents were produced on March 21, 2019 and these documents reveal a new story about what the BPD did with those phones after they were seized on January 14, 2016.[14]

Another version of the Bennington Police Department Property Report[15] (that was not produced by the government until March 21, 2019) indicates that Detective Anthony Silvestro removed the Mayhew/Garcia phones from Temporary Evidence for "Safekeeping" at 10 a.m., just 50 minutes after those phones had been placed there by Officer Murawski. According to this latest version of this BPD Property Report, Silvestro

---

[14] The newly disclosed documents answer another question, i.e., did Chief Doucette follow through on his late afternoon suggestion (while interrogating Mayhew on January 14, 2016) that if Mayhew named John Chinnici as his accomplice, he would give Mayhew his opiate mediation?

While being interrogated on January 14, 2016, Mayhew repeatedly refused to name his accomplice. After Mayhew had been in police custody for about 10 hours, Chief Doucette made this suggestion:

> [W]e are doing our best to work this out so that you and Vanessa can still be together and work through your issues because I want you to stay in the Suboxone program … I don't want you to take the rap alone. You're not the guy with the gun … I don't want this turd-knocker [i.e., John Chinnici] downstairs out and about, on the streets and I already told you. He's going to jail. I'm telling you, he's gonna go to jail and you know, the guy you should be concerned for yourself, is you. *So that we can get you your medication* and do all the things that you need to do so you can stay employed, so on and so forth … I know you're scared. You know? I mean it's, we talked about it in my office and I know you're scared, but John Chinnici is the freak. We we know that, but you've gotta be the one to officially say that. He had the gun. Not you. We've talked about that. *Ex. 21, pp. 5-6* (emphasis added).

Shortly after Chief Doucette made this pitch, Austin Mayhew named John Chinnici as his gun-wielding accomplice. *Ex. 22*. Minutes later, Doucette gave him the Suboxone found in Vanessa Garcia's purse. *Ex. 71*.

[15] A copy of this document was not found in the discovery provided to Mr. Chinnici's public defender while his case was pending in state court.

17

returned the phones to the Temporary Evidence Room 19 days later, on February 2, 2016. *Ex. 72*.

A different version of the BPD Property Report indicates that Det. Cole transferred the evidence seized at the Mayhew/Garcia apartment from Temporary Evidence into "Deep Evidence" on January 21, 2016. *Ex. 73*. Because Det. Silvestro already had taken the three cell phones listed on this document into "Safekeeping" on January 16, 2016 and did not return them until February 2, 2016, the phones could not have been transferred by Cole to "Deep Evidence" on January 21, 2016.

In February 2019, the government disclosed that the two cells phones turned up in the desk drawer. Previously, the government had not disclosed (a) that forensic phone examiner Silvestro removed the phones from Temporary Evidence room for "Safekeeping;" (b) that Silvestro did not return the phones to the Temporary Evidence Room for 19 days; or (c) what Silvestro was doing with those phones while he had them in his possession for "Safekeeping."[16]

---

[16] On May 2, 2019, the United States Attorney's office produced two additional documents addressing the disappearance of the Garcia and Mayhew cell phones. The first document is a composite of two entries made in the Bennington Police Temporary Evidence Control Log. *Ex. 73(b)*. The first entry refers to Officer Murawski placing the two phones into temporary evidence at 9:10 a.m. on January 14, 2016. *Ex. 73(b)*. This entry mirrors the entry made on the BPD Property Report, *Ex. 57*.

The second entry in the composite Bennington Police Temporary Evidence Control Log refers to BPD Officer Sleasman placing a different cell phone seized from Vanessa Garcia on January 16, 2016 when she was arrested by a Bennington County deputy sheriff, as reflected in *Ex.73(d)*.

Neither of these entries solves the mysterious disappearance of the two cell phones seized from the Mayhew/Garcia apartment on January 14, 2016.

The second document produced on May 2, 2019 is an undated statement prepared by Det. Silvestro. The report confirms that Det. Silvestro checked the phones out of Temporary Evidence and that he took them to another office where he may have attempted to extract the data on the phones. Det. Silvestro apparently did not prepare a report documenting what he did with the phones, his attempted extraction, the legal basis for the extraction (i.e., did he have a search warrant to search the phones or did he have the owners' permission), or whether the extraction was successful. *Ex. 73(c)*.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

(ii)     **AT&T call records for the accounts associated with the two cell phones**

In March 2019 AT&T produced detailed records for the accounts associated with Vanessa Garcia's cell phone, 802-430-1327, and Austin Mayhew's cell phone, 802-430-2833.[17] *Ex. 74.*[18]

An analysis of the records produced by AT&T for the Garcia cell phone indicates that between December 31, 2015 and January 14, 2016 the Garcia cell phone registered 441 voice call entries. During that same time frame, the records indicate that the Garcia cell phone registered 1935 SMS message entries. *Ex. 75.*

An analysis of the records produced by AT&T for the Mayhew cell phone indicates that between December 31, 2015 and January 14, 2016 the Mayhew cell phone registered 348 voice call entries. During that same time frame, the records indicate that the Mayhew cell phone registered 590 SMS message entries. *Ex. 76.*

(iii)     **Evidence of Scott Galusha's participation in the robbery**

The AT&T call records for Austin Mayhew's cell phone prove that Scott Galusha lied at trial when he denied any telephone contact with Mayhew after he was robbed by the two masked men.[19]

---

In a letter dated June 5, 2019, the prosecutor disclosed that BPD was unable to determine whether either Garcia or Mayhew consented to a search of their phones or whether BPD obtained a warrant to search the phones. In addition, BPD was unable to locate any additional chain of custody records related to BPD's custody of the three missing cell phones or whether BPD searched or attempted to search those phones. *Ex. 100(a).*

[17] In January 2019, Austin Mayhew confirmed which one of the two flip phones belonged to him. *See* Agent Brown's search warrant application for Vanessa Garcia's phone, Doc. 108-3.

[18] The AT&T records key that accompanies the call records indicated that the Connect Time is expressed in UTC. Eastern Standard Time is UTC minus five hours. *Ex. 74.*

[19] On cross-examination, Galusha provided the following testimony:

Q. Now, your girlfriend at that time, at least, was Austin Mayhew's sister?

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

The AT&T call records show that between 8:59:15 a.m. and 3:28:37 p.m. on January 11, 2016 the Mayhew cell phone received 15 voice calls from 802-447-7064. *Ex. 77, Items 223, 224, 229-231, 238, 239, 241, 243-245*. In addition, the Mayhew cell phone made eight voice calls to 802-447-7064 in the same time period. *Ex. 77, Items 227, 228, 233-237, 242*. About five-and-one-half hours before the first of these calls was made, Scott Galusha identified 802-447-7064 as his number in his sworn statement to the Bennington Police. *Ex. 68.*[20]

Had defense counsel obtained the AT&T call records before trial, he could have confronted Scott Galusha and demonstrated that he and Mayhew were in constant contact right after the robbery. The AT&T call records would have also provided the missing link confirming the widespread suspicion that the robbery was an inside job, and completely undermined Mayhew's claim that the robbery was John Chinnici's idea.[21]

---

A. Still is.

Q. Still is. She still is his sister, and she's still your girlfriend.

A. Yeah, still both.

Q. Okay. Both. Yeah. And when you got home, or later in the morning, did you call Austin's house?

A. Did I call Austin's house.

Q. Yes. Or did you talk to him on the phone?

A. No.  *Ex. 68(a), Trial transcript, Vol. 2, p. 60.*

[20] According to the AT&T call records, the Mayhew cell phone received three calls from 802-447-7064 just before 7:00 p.m. on January 14, 2016, or a little over an hour after Mayhew was released from police custody. *Ex. 78, Items 341-343.* The Garcia cell phone received three calls from 802-447-7064 around the same time. *Ex. 82, Items 439-441.* By then, the phones were in the custody of Det. Silvestro who had taken it out of Temporary Evidence for "Safekeeping."

[21] In contrast to the many voice calls between the Mayhew phone and the Galusha phone, ATF's Cellebrite Report for the Chinnici phone indicates no contact between John Chinnici's phone and either Mayhew's phone or Galusha's phone.

IARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Mayhew testified at trial that after they returned from their trip from Dover, Vermont on the evening of January 10, 2016, John Chinnici reminded Mayhew he owed him money for pills that Chinnici had fronted him and Vanessa. Mayhew claimed that John Chinnici wanted the debt repaid sooner rather than later and told Mayhew he could settle the debt if Mayhew helped him commit a robbery that night. *Trial transcript, Vol. 2, p. 120*. The idea that some random person, ripe to be robbed, would be wandering the streets of Bennington, Vermont shortly after midnight in the middle of winter with a bag of money is pretty far-fetched. Nevertheless, Mayhew continued spinning his tale.

After reluctantly agreeing to help John find and rob that random person, Mayhew testified that he and John changed into dark-colored clothing at his apartment, covered their faces, and headed out the door together to walk east on Main Street toward downtown Bennington. *Trial transcript, Vol. 2, pp. 120-122*.

When they were arrested on January 14, 2014, Mayhew was 5'10" tall and weighed 135 pounds; John Chinnici was two inches shorter and was 105 pounds heavier than Mayhew. Where John found the correctly fitting dark clothing at Mayhew's apartment that he allegedly changed into to commit the robbery is anybody's guess. On cross-examination, Mayhew first suggested that John might have borrowed some of his clothes but, perhaps realizing how preposterous this idea was, testified that he could not remember where John got his dark clothes. *Trial transcript, Vol. 2, p. 160-61*.

According to Mayhew, shortly after they walked downtown together, he and John were serendipitously lucky enough to find someone to rob. Just as Martin's Mobil closed, they crossed paths with Scott Galusha and Anthony Falace as they crossed Main Street to

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

drop the day's receipts into the bank's night deposit box. *Trial transcript, Vol. 2, 110-122.[22]*

If Galusha was in on the heist, Mayhew's claim that he and John "kind of winged it, made it up as we went" falls apart. The robbery would have been planned in advance and Mayhew would have known exactly when Galusha and Falace would be leaving the store with the night deposit bag.

To cover up their joint venture, Galusha had to lie about the calls he made to, and received from, Austin Mayhew shortly after the robbery, and Mayhew had to lie about the robbery's genesis and falsely claim that it was all John's idea.

Had defense counsel listened to his client and obtained the AT&T call records for the account associated with Austin Mayhew's cell phone, the jury would have seen Scott Galusha and Austin Mayhew for what they were and acquitted John Chinnici.

(iv)     **Data extracted from Mayhew and Garcia's cell phones**

In March, 2019, after receiving consent from Austin Mayhew to search his cell phone (802-430-2833) and a warrant to search Vanessa Garcia's cell phone (802-430-1327), ATF Special Agent Matthew Eckstrom did a logical extraction of the data on the cell phones using software developed by Cellebrite. *Ex. 79 and Ex. 80.* As Det. Silvestro, the BPD's forensic phone examiner, testified at trial "you are not going to get deleted information" in a logical data extraction. *Trial transcript, Vol. 3, pp. 119-120.*

According to the AT&T records, between December 31, 2015 and January 16, 2016, Garcia's phone sent/received 449 voice calls and sent/received 1955 text messages.

---

[22] Of course, it is always possible for someone to know in advance that a convenience store clerk would be crossing the street to a bank's night deposit box with the day's receipts at a particular time. But that is not what Mayhew testified to. In his own words, he and John Chinnici did not have a "target in mind" and that "[w]e kind of winged it." *Trial transcript, Vol. 2, p. 122.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Between December 31, 2015 and January 16, 2016, Mayhew's phone sent/received 352 voice calls and sent/received 591 text messages. None of the voice calls were recovered when Agent Eckstrom conducted the logical extractions on Vanessa Garcia's and Austin Mayhew's phones. *Ex. 79 and Ex. 80.* Ten text messages were recovered from the Mayhew phone and 57 text messages were recovered from the Garcia phone. *Ex. 79 and Ex. 80.* None of the recovered messages were sent or received on January 10, 2016 or January 11, 2016.

**(v) Voice calls made from the two phones after Det. Silvestro removed them from the Temporary Evidence Room**

At 10:00 a.m. on January 14, 2016 Det. Silvestro removed the two flip phones seized at the Mayhew/Garcia apartment from the Temporary Evidence Room for "Safekeeping." *Ex. 72.*[23] When Silvestro removed the phones from the Temporary Evidence Room, Det. Cole was wrapping up BPD's second interview of Austin Mayhew. *Ex. 14.*

Thirty-five minutes after Silvestro removed the phones from the Temporary Evidence Room, Det. Cole and Det. Silvestro arrived at John Chinnici's parents' apartment on Main Street in Bennington and started interviewing John Chinnici.[24]

At 11:45 a.m., Det. Cole, joined by Chief Doucette, initiated BPD's third interview with Austin Mayhew. *Ex. 16.* At 11:47:45 a.m.,[25] an outgoing voice call was

---

[23] The United States Attorney's Office provided this BPD Property Report to the defense on March 3, 2019. It is unclear why this crucial piece of evidence was not disclosed before trial. *Ex. 72(a).*

[24] After Det. Cole and Det. Silvestro left to interview John Chinnici, Chief Doucette took Austin Mayhew aside and tried to persuade Mayhew to name John Chinnici as his accomplice. Mayhew declined the invitation to name John Chinnici. This interview was not recorded. *Ex. 16(a).*

[25] The AT&T call records use UTC (Coordinated Universal Time) to document the time a call (or other event, i.e., a text message) is placed or received. On January 14, 2016, Eastern Standard Time was UTC

JARVIS, McARTHUR
& WILLIAMS

ATTORNEYS AT LAW

SUITE 2E – PARK PLAZA

95 ST. PAUL STREET

P. O. BOX 902

BURLINGTON, VT

05402-0902

802-658-9411

placed from Vanessa Garcia's phone to a phone or similar device assigned the number 401-369-3201 and that the call was connected for 1:18 minutes. *Ex. 81, Item 427.*

Before placing these calls, someone had to have turned the Garcia phone on, taken it out of Airplane Mode,[26] given time for the phone to connect with the mobile network, and manually dialed the number 401-369-3201. *See Ex. 81(i), Summary of Findings for Requested Digital Forensic Analysis, p. 14.* Or, as Det. Silvestro testified at trial: "You put the phone in airplane mode so that there's no – you don't want incoming and outgoing calls or text messages when you are [examining] the phone." *Trial transcript, Vol. 3, p. 127.*

The AT&T call records further indicate that three additional voice calls were placed from Vanessa Garcia's phone to a phone or similar device assigned the number 401-369-3201 later that same day. *Ex. 81, Items 432, 434, and 438.* Two additional voice calls were placed from Vanessa Garcia's phone to a phone or similar device assigned the number 401-369-3201 on January 15, 2016 and January 16, 2016. *Ex. 81, Items 444 and 447.*

---

minus five hours. Thus, the AT&T call records indicate that call number 427 was placed at 16:47:45 UTC, or 11:47:45 a.m., EST.

[26] The search warrant application was submitted by Bennington Police Officer Robert Murawski. *Ex. 81(b).* During the search, the police seized three cell phones: a Samsung Galaxy smartphone and two AT&T flip phones. *Ex. 81(c).* Officer Murawski placed the evidence seized during the search, including the three cell phones, into BPD's Temporary evidence room at 9:10 a.m. *Ex. 81(d).*

According to his testimony in *United States v. Joyce,* Doc. No.15-cr-156, Officer Murawski would have put seized cell phones into "Airplane Mode" so that data on those phones could not be remotely erased or otherwise compromised. *Ex. 81(e).*

Unlike the cell phones in the Chinnici investigation, the Bennington Police had no trouble keeping track of the cell phones seized by Officer Murawski on December 4, 2014 in the Joyce case. *Ex. 81(f), p. 2; Ex. 81(g).* In *U.S. v. Joyce,* the cell phones were retrieved in November 2016 so that those phones could be searched before trial. *See U.S. v. Joyce, Doc. 50. Ex. 81(h).*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E - PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Before Garcia's phone was seized, there were 40 calls between her phone and the phone or similar device assigned the number 401-369-3201. *Ex. 81(a)*.[27]

It probably is not a coincidence that 19 of these calls occurred on January 3, 2016, starting shortly after Austin Mayhew was assaulted by Fernando Corrales with a baseball bat following a drug deal that went bad. This incident served as the basis for BPD's application to search Mayhew's and Garcia's apartment nine days later. *Ex. 81(b)*.

Another 12 calls were exchanged between Garcia's phone and 401-369-3201 on January 10, 2016 and January 11, 2016. *Ex. 81(a)*.

The first call from Austin Mayhew's phone was placed to a phone or similar device assigned the number 401-369-3201 on January 14, 2016 at 12:16:03 p.m. *Ex. 78, Item 331*. When this call was placed, Mayhew was being interviewed by Det. Cole for the third time. *See Ex. 16, Defendant's Motion for a New Trial.*

As with Garcia's phone, someone had to have turned the Mayhew phone on, taken it out of Airplane Mode, given time for the phone to connect with the mobile network, and manually dialed the number 401-369-3201. *See Ex. 81j, Summary of Findings for Requested Digital Forensic Analysis, p. 13.*

Four more voice calls were placed from or forwarded through Austin Mayhew's phone to a phone or similar device assigned the number 401-369-3201 later that day. *Ex. 78, Items 336, 340, 344, and 347*. A final call was placed from Austin Mayhew's phone to a phone or similar device assigned the number 401-369-3201 on January 15, 2016. *Ex. 78, Item 351*.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

---

[27] According to the AT&T call records, there were no text messages exchanged between Mayhew's phone and 401-369-3201.

25

Before Mayhew's phone was seized, there were 41 voice calls between his phone and the phone or similar device assigned the number 401-369-3201. *See Ex. 78(b).*

It probably is not a coincidence that the first 18 of these calls occurred on January 3, 2016, starting shortly after Fernando Corrales stopped by Austin Mayhew's apartment to arrange a drug deal. *Ex. 78(a), Ex. 78(b)* and *Ex. 102.*

Another 17 calls were exchanged between Mayhew's phone and 401-369-3201 on January 10, 2016 and January 11, 2016. *Ex. 78(a)* and *Ex. 78(b).*

To date, no one from the BPD or the United States Attorney's Office has explained who placed the calls to the phone or similar device assigned the number 401-369-3201 after those phones had been seized as evidence or why those calls were placed to that number.

> **(vi)** **Text messages received by the Mayhew and Garcia cell phones after those phones were seized by the Bennington Police on January 14, 2016.**

The ATF extracted data from the Mayhew and Garcia cell phones on March 13, 2019. *Ex. 79* and *Ex. 80.* The extraction report for the Mayhew cell phone indicates that the Mayhew cell phone received 5 SMS messages after it was seized by the Bennington Police. *Ex. 79, p. 8, Items 1-5.* The same report indicates that the status of those messages is "Read." *Id.*

The extraction report for the Garcia cell phone indicates that the Garcia cell phone received five SMS messages after it was seized by the Bennington Police. *Ex. 80, p. 5, Items 1-5.* The same report indicates that the status of those messages is "Read." *Id.*

The status of the messages displaying "Read" indicates that someone had to have turned the phone on, taken it out of Airplane Mode, given it time to connect to the mobile

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

26

network, and physically viewed the messages on the phone. Had an SMS message been received but never viewed, "the Status would have displayed "Unread" as it did for messages 8-10" in the Garcia phone. *Ex. 80, p. 5 Items 8-10*.

To date, no one from the BPD or the United States Attorney's Office has explained who read the text messages received by the Mayhew and Garcia cell phones after those phones had been seized as evidence and when those messages were read. *Ex. 100(a)*.

> (vii)   **Evidence that BPD tampered with two cell phones seized from Mayhew and Garcia bolsters the defense theory that BPD intentionally destroyed John Chinnici's Samsung cell phone**

According to Ashley Raleigh, John was communicating to her and Stephanie Dockery using Facebook Messenger between approximately midnight and 1 a.m. on January 11, 2016. *Ex. 55*.

In pretrial discovery, the government provided proof that John Chinnici used Facebook Messenger to communicate with his friends. *See Ex. 83* (images of Facebook Messenger text communications provided to investigators by Trisha Farkas) and *Ex. 83(a)* (SMS text messages 1513 and 1515 from John Chinnici to Stephanie Dockery, 1/10/16 at 9:42:57 p.m. and 9:53:19 p.m.).

In March 2019, the government provided discovery confirming that Det. Cole had his own Facebook account and knew how to use Facebook Messenger because he sent messages others, including Austin Mayhew, using Facebook Messenger. *Ex. 56(a)*.

According to Facebook, Facebook Messenger text messages are stored in the user's Facebook account and stay there unless and until those messages are deleted by someone with access to that account. *Ex. 83(b)*.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

The Vermont Superior Court granted BPD's request to search John Chinnici's Samsung phone on January 15, 2016, and "seize any and all files, or evidence of files to include <u>Voice mails</u>, <u>Chat logs</u>, <u>MMS</u>, <u>SMS</u> conversations between the user of the device or other persons pertaining to the armed robbery of Martins [*sic*] Mobil employees on January 11[th], 2015 …" *Ex. 83(c)*.

After the Superior Court issued the search warrant, Det. Silvestro examined John Chinnici's Samsung smart phone. Silvestro testified at trial that the phone was not locked or otherwise password-protected. *Trial transcript, Vol. 3, p. 127*. The phone was in "airplane mode" to prevent incoming and outgoing phone calls or text messages from interfering with data extraction and to prevent the remote deletion of data from the phone. *Trial transcript, Vol. 3, pp. 127-128*.

Having requested permission to search chat log files, BPD officers almost certainly would have accessed the Facebook application (that was not password-protected) on the Samsung phone to find out whether there were any communications between "the user of the device or other persons pertaining to the armed robbery of Martins [*sic*] Mobil employees on January 11[th], 2015 …"

And while the detectives would not have known who Ashley Raleigh was, they certainly knew that Stephanie Dockery was in a relationship with John and searched the message file associated with her name.[28] Saved in John's Facebook Messenger application, the detectives would have found the text conversation described by Ashley Raleigh in her affidavit.

---

[28] On January 19, 2016 at 11:03, someone at BPD ran Stephanie Dockery's name through its "Main Name Tables" database. *Ex. 83(d)*.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Defense counsel was granted permission to search his client's Facebook account for the January 11, 2016 text communication described by Ashley Raleigh. Those text messages, together with all pre-January 15, 2016 text communications with Ashley Raleigh, Stephanie Dockery, and Trisha Farkas have been deleted from John Chinnici's Facebook account. *Ex. 83(e).*

Neither John Chinnici, nor anyone with his best interests in mind, had any incentive to delete the exculpatory text communications described by Ashley Raleigh in her affidavit from John's Facebook account. Others who did not have John Chinnici's best interests in mind and who had access to his Facebook account, like BPD, did.

BPD had the opportunity and the motive to tamper with and destroy exculpatory evidence. The AT&T call records and the Cellebrite extractions related to the Mayhew/Garcia cell phones shows that BPD had tampered with those phones after they were seized.

The Facebook Messenger app on John Chinnici's phone was not password-protected, and anyone with access to the phone had access to his Facebook account. *Ex. 70, ¶ 9.* The evidence shows that Det. Cole decided that John Chinnici was the chief suspect within hours of the Martin's Mobil robbery, searched for pictures of John on Facebook and showed them to Anthony Falace, and thereafter did everything he could to prove that his hunch was right, knowing all along that his most important witness was a liar and that the eyewitnesses' description of the armed robber perfectly fit someone he would later recruit as an informant.[29]

---

[29] It is probably not surprising that Det. Cole recruited his informant (who was 5'8' tall, weighed 180 pounds and spoke with a Brooklyn accent) to develop information about Fernando Corrales, the person who allegedly assaulted Austin Mayhew on January 3, 2016 after the drug deal went bad. *See Defendant's Motion for a New Trial, Ex. 37* and *Ex. 38.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

4.  **Newly discovered evidence related to the Facebook photos depicting John Chinnici shown to Anthony Falace**

Anthony Falace, the Martin's Mobil clerk who was robbed at gunpoint by two masked men, disclosed at trial that while he was being interviewed by the police following the robbery he was looking "through photos on Facebook" and that the police officers "were showing [him] random people with – that had facial tattoos." *Trial transcript, Vol. 2, p. 42.*

When the parties disagreed about the nature of the disclosure of the photo show-up in pretrial discovery, the Court expressed its concern that "if it's a police lineup and it wasn't disclosed to the defendant, that's a problem. If it's a police lineup and it was disclosed to the defendant and there's something wrong with it, like a one photo or if it's only of these people, there might be something wrong with it." *Trial transcript, Vol. 2, p. 45.*

As the Court is aware, defense counsel did not file a pretrial motion to exclude Falace's tainted identification testimony, move to strike Falace's testimony that the armed robber had a facial tattoo, or request a mistrial when it became clear that Det. Cole had orchestrated the illegal photo show-up.

After the trial ended, the defense requested information related to the photo show-up. In response to this request, Det. Cole asserted that the police did not show Falace any photos and that Falace must have found any photos of John Chinnici on his own. As the defense pointed out in its Motion for a New Trial, Det. Cole's assertion is ridiculous because (a) Falace did not know John Chinnici or his brother, Michael, by either their first or last names before he met with Det. Cole; and, (b) without knowing their names, Falace could not have found their pictures on Facebook.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

In addition, we now know that Det. Cole had his own Facebook account and knew how to use Facebook for, among other things, to find and contact people using Facebook Messenger. *Ex. 56(a).*

What's more, the very photos described by Falace at trial were produced by the government in discovery. *Ex. 84.*[30] The photos produced in discovery show John's facial tattoo and include handwritten notations indicating that they are pictures of "John," one of which has an arrow pointing in John's direction. *Ex. 84.*

With this in mind, counsel asked the prosecutor to disclose who downloaded and printed the Facebook photos produced in discovery, what computer was used to search for those photos, what printer was used to print them out, and who made the handwritten notations on the photos. Det. Cole admitted that he found the photos, downloaded, and printed the photos and made the handwritten notes on those photos. *Ex. 85, ¶ 24.*

By January 11, 2016, Det. Cole already knew who John Chinnici was and what he looked like because, as he put it on January 14, 2016, John Chinnici was "on our radar sights." *Ex. 15, p. 55.* The only plausible reason why Det. Cole wrote John's name on the photographs and put an arrow pointing at John was to influence Anthony Falace and persuade Falace that John was the robber pointing the gun at him.

The unlawful photo show-up had an immediate and prejudicial impact on a critical eyewitness to the robbery. Before Det. Cole showed Falace the Facebook photos of John with his distinctive facial tattoo, Falace had not mentioned that one of the robbers had a distinctive facial tattoo. Immediately after the robbery, Bennington Police Officer

---

[30] *See Ex. 3, p. 6* (Falace: "I'm assuming that it's Mike because of the height ratio now. Like I thought it was Jeremy Miller just 'cuz of the eyes. You know lots of things rolling around in my head. Ah Chin, Chinin, Chinnici. Det. Cole: Where are you coming up with that? Falace: Because of their pictures. They were posing on Facebook and the height difference and the weight difference.")

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Joshua Stemp interviewed Falace and asked Falace to provide a written statement. While Falace provided a detailed description of the gunman (a 5'10" tall male who weighed about 185-190 pounds and had a "Hispanic complexion" with a "dark colored scarf "around his face), Falace did not say anything about a facial tattoo. *See Ex. 2 and Ex. 1(d).*

After Det. Cole showed Falace the Facebook photo of John Chinnici with the distinctive facial tattoo, Falace first mentions that one of the robbers had "a mole on the side of his face too. It's like a star …" *Ex. 3, p. 10.* When Falace testified at trial, the government made sure that he identified the robber with the facial tattoo:

Q: And did that voice, if at all, remind you of anyone?

A: Well, a picture came into my mind of someone that had, like, facial tattoos, and I couldn't – I never met the person before. Like, the person, I might have seen, like, come into the store or something. Like, I really couldn't picture the faces. I remember they had, like, facial tattoos.

Q: So you associated the voice with the – someone who you were familiar with who had facial tattoos; is that right?

A: Right. Someone that came in the store or something, where I met, but I couldn't put a name to it because I didn't know the name. *Trial transcript, Vol. 2, p. 30.*

In her closing argument, the prosecutor made it a point to call the jury's attention to this testimony in an effort to bolster Mayhew's claim that John Chinnici participated in the robbery:

The testimony of Anthony Falace is another way that Mr. Mayhew's statement that Mr. Chinnici did the robbery with him is corroborated, because remember this testimony from Mr. Falace. He said that he recognized -- that the -- the guy with the gun was the only one who talked, and he recognized the voice. The voice reminded him of somebody that he knew or had experience pretty much -- probably at the store, who had a lot of face tattoos. He was aware of the face tattoos. Remember, there was even discussion, and that afterwards in the Bennington PD where they were kind of looking through things to try and see if

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

there was somebody with a face tattoo. This was -- this was something. Well, who has face tattoos? Mr. Chinnici has face tattoos. You have -- If we can have Bates number 1111, please. Exhibit 5. That's a picture of Mr. Chinnici in January 2016. Obvious face tattoos. *Trial transcript, Vol. 4, 51-52.*[31]

### 5.   Frank Chinnici's Brooklyn accent

Anthony Falace and Scott Galusha have both confirmed that the robber who was holding the silver pistol spoke with a distinct Brooklyn or New York accent. *Ex. 3, p. 6* (Falace on 1/11/16: "like an accent or something. Not like, like a slight Brooklyn accent, like a New York accent"); *Ex. 69(a)* (Galusha on 5/26/16: "the armed individual had a heavy Brooklyn accent"); *Trial transcript, Vol. 2, p. 29* (Falace, when asked to describe the gunman's voice: "Well, to me they had, like, an accent, which I referred to at the time a, like, New York accent. It didn't just sound like they were from around Vermont area, which -- that's just my opinion at the time"); *Trial transcript, Vol. 2, p. 53* (Galusha, when asked to describe the gunman's voice: "Like a New York accent").

After the Court granted the government's motion for a detention order, John Chinnici was held at the Essex County Jail in Lewis, New York. The Essex County jail records inmate phone calls and the United States Attorney's Office obtained a copy of the recordings of John Chinnici's Essex County jail calls for the period 8/1/17 through 3/1/18. *Ex. 87.*

---

[31] The prejudicial impact of the unlawful show-up was not limited to Falace's trial testimony that the armed robbery sported a facial tattoo. After Det. Cole showed Falace the Facebook photo of a "random" person with the star tattoo and told Falace that person's name was John Chinnici, Falace went on Facebook to find out more about John Chinnici. Somehow Vanessa Garcia found out that Falace was conducting this research and warned John Chinnici in a text message that "Anthony Falace block him he was trying to look you." *Ex. 86, Texts 868-869.*

Det. Cole's misconduct thus reinforced Falace's mistaken belief that the person with the gun had a facial tattoo.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

On December 9, 2017, John Chinnici made a phone call to his brother Michael's cell phone. When he received the call, Michael was with his uncle, Frank Chinnici. After speaking with John, Michael turned his phone over to Frank, who spoke with John. *Ex. 88.*

Michael Chinnici has had an opportunity to listen to the recording of that phone call and has identified the moment when Frank Chinnici starts talking to John, i.e., just before the "one-minute warning" can be heard on the recording. *Ex. 88.*

A copy of the recording is marked as Exhibit 89. In the recording, Frank Chinnici can be heard speaking with the distinct Brooklyn/New York accent described by Anthony Falace and Scott Galusha right after they were robbed at gunpoint on January 11, 2016.

Unlike Frank Chinnici, this recording demonstrates that neither John nor Michael Chinnici speak with a New York or Brooklyn accent.

### 6. The Government's elicitation of Austin Mayhew's perjured testimony violated John Chinnici's constitutional right to due process of law

The Hemmings Motor News surveillance video, together with Det. Cole's notes compiled as he first watched that video, conclusively prove that Austin Mayhew lied when he told the jury that he and John Chinnici left his apartment together on foot and walked east on Main Street shortly after midnight, January 11, 2016, in the hopes of finding someone to rob. *Ex. 43 and Ex. 54.*

The prosecutor who elicited this false testimony knew or should have known that Mayhew was about to lie to the jury. The prosecutor who elicited this testimony was present during Vanessa Garcia's June 6, 2018 proffer interview when "[i]nvestigators explained to Garcia that there was a video of her vehicle leaving the apartment before the robbery and returning sometime after." *Ex. 5(a).* The same prosecutor presented

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Mayhew's testimony to the grand jury where he testified that after he and John Chinnici changed into the dark clothing, "[w]e started walking down Main Street." *Ex. 46, p. 17.*

It is nearly inconceivable that the prosecutor would not have reviewed that surveillance video, reviewed Det. Cole's notes, and discussed the video with Det. Cole and ATF Agent Brown at some point before trial. By July 2018, the prosecutor had been involved in this investigation for over two years, and, having participated in the March 16, 2016 interview of Austin Mayhew and presented his testimony to the grand jury, knew what Mayhew's story was. *Ex. 44.*

The United States Constitution prohibits government prosecutors from knowingly eliciting false testimony in a criminal case. *Mooney v. Holohan,* 294 U.S. 103, 112 (1935) (the presentation of testimony known to be perjured is "inconsistent with the rudimentary demands of justice"). *Shih Wei Su v. Filion,* 335 F.3d 119 (2d Cir. 2003) ("a conviction obtained through testimony the prosecutor knows to be false is repugnant to the Constitution").

In the event false testimony is introduced at trial, a conviction must be set aside "unless there is no 'reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Shih Wei Su v. Filion,* 335 F.3d 119, 127 (2d Cir. 2003), quoting *United States v. Agurs,* 427 U.S. 97, 103 (1976); *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir. 1991) (the U.S. Supreme Court cases mean that "if it is establish that the government knowingly permitted the introduction of false testimony reversal is virtually automatic").

Courts examining this issue must ask: "(1) whether false testimony was introduced; (2) whether that testimony either was or should have been known to the

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

prosecution to be false; (3) whether the testimony went uncorrected; and, (4) whether the false testimony was prejudicial in the sense defined by the Supreme Court in *Agurs*", i.e., "the reviewing judge must set aside the verdict and judgment unless his [or her] 'conviction is sure that the error did not influence the jury, or had but very slight effect.'" *Shih Wei Su v. Filion*, 335 F.3d at 127.

The Hemmings Motor News video leaves no doubt that Mayhew's testimony that John Chinnici was with him when he left his apartment to commit the robbery was false. The prosecutor who had been involved in the investigation for over two years knew or should have known about this video and that the story Mayhew was about to tell the jury was false. Once Mayhew provided this false testimony, the prosecutor did not correct it and the defense attorney, who was apparently unaware of the video or Cole's corresponding notes, did not introduce either the video or the notes when he cross-examined Mayhew and Cole.

Finally, Mayhew's false testimony was obviously prejudicial. The government was unable to offer any other direct evidence that John Chinnici participated in the robbery. The government spent most of its time disproving John Chinnici's mistaken alibi that he was with Trisha and Robert Farkas when the robbery occurred. Neither eyewitness positively identified John Chinnici at trial. In fact, John Chinnici was considerably heavier than the person they described and he does not speak with a distinctive Brooklyn or New York accent.

Because the prosecutor elicited false, inculpatory testimony from their most important witness, this Court should vacate the guilty verdict and order a new trial. *Napue v. Illinois*, 360 U.S. 264 (1959) (a criminal conviction obtained through the use of

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

false evidence, known by representatives of the government, violates due process of law); *Giglio v. United States*, 405 U.S. 150, 153 (1972) ("deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with' rudimentary demands of justice'").

## ARGUMENT

Had the United States Attorney's Office fully complied with its discovery obligations in this case[32], and had defense counsel reviewed the discovery that was provided to him, conducted a thorough investigation into the circumstances surrounding the January 11, 2016 armed robbery, and effectively represented his client at trial, the outcome of this case would have undoubtedly been different.

The government withheld Frank Chinnici's criminal record check that included information about his height, weight, and skin tone; did not produce the BPD property report indicating that Det. Silvestro removed the Mayhew/Garcia cell phones from Temporary Evidence on January14, 2016; withheld two emails sent by Det. Cole related to his inability to locate John Chinnici's cell phone; withheld BPD's Temporary Evidence Control log entries related to the three "lost" phones; and, withheld the June 27, 2018 email communication between the US Attorney's Office and Det. Cole, telling Det. Cole not to provide a written explanation about what happened to the Garcia/Mayhew phones. When asked to explain what happened to those phones, the prosecutor provided curiously vague responses to the Court and later to defense counsel.[33]

---

[32] *See Appendix B*, Government Discovery Violations, and *Appendix C*, Government Discovery Index through trial.

[33] When the Court asked "Why was [John Chinnici's] phone lost," the prosecutor responded: "That's a great question." *Trial transcript, Vol. 3, p. 14.* No explanation was ever provided, except that BPD made "exhaustive efforts" to find the phone after it went missing. *Trial transcript, Vol. 3, p. 108.*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Had defense counsel carefully reviewed the discovery that had been made available to him by the lawyers who had represented John Chinnici in state court and the discovery that was provided to him by the United States Attorney's office, he would have filed a *Franks* motion challenging the search warrant application submitted by Det. Cole that was replete with false and misleading information and which left out crucial exculpatory information that Austin Mayhew repeatedly lied during his many post-arrest interviews. He also would have filed a motion to suppress his client's post-arrest statement and any evidence derived from the search of his client's phone based on *Dunaway v. New York* because the evidence clearly showed that the Bennington Police arrested his client without probable cause at 3:00 p.m., i.e., forty-five minutes before Austin Mayhew first identified John Chinnici as his accomplice in the robbery. Finally, defense counsel should have filed a motion challenging the unlawful use the Facebook photos that tainted Falace's eyewitness account of the robbery.

After learning that the Bennington Police "lost" the three cell phones, defense counsel should have tried to find out how they could have disappeared from the department's evidence rooms without a trace. He also should have subpoenaed the AT&T call records for the two accounts associated with Mayhew's cell phone and Garcia's cell phone. Had he obtained those records, he could have offered evidence that the Bennington Police tampered with the Mayhew and Garcia phones after they were seized.

---

The prosecutor told the Court that "every call I had with Det. Cole began with, Have you found the phone yet?" *Trial transcript, Vol. 3, p. 108.*

When asked by defense counsel to disclose what she and Det. Cole discussed during those telephone conversations, the prosecutor claimed that she had "no specific recollection of any specific conversation about the phones." *Ex. 100(a).*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802–658–9411

Had he obtained the AT&T call records, defense counsel would have been able to show that Scott Galusha falsely denied being in telephone contact with Austin Mayhew shortly after the robbery, evidence that further suggested that the robbery was planned in advance and that it was an inside job.

When he learned from Ashley Raleigh that she was exchanging text messages using Facebook Messenger while the robbery was in progress, defense counsel should have alerted the Court of the newly discovered alibi evidence and requested a continuance. Had he checked John's Facebook Messenger account, he would have discovered that someone deleted the Facebook Messenger texts he exchanged with Ashley Raleigh, Stephanie Dockery, and Trisha Farkas before his arrest.

And, since no one in John Chinnici's camp would have had any motive to delete exculpatory evidence, someone else destroyed that evidence. Furthermore, the deletion of the Facebook Messenger texts probably explains why John's Samsung phone with its Facebook Messenger app disappeared without a trace.

During the trial, defense counsel should have pointed out that John Chinnici was 50 to 60 pounds heavier than the description of the armed robber provided by Falace and Mayhew and that his client does not speak with a New York or Brooklyn accent. At the same time, defense counsel should have introduced evidence that Frank Chinnici fit the physical description of the armed robber and spoke with a Brooklyn accent, that he was living in and working in Bennington in January 2016, and that he displayed a photo of a silver semiautomatic pistol on his Facebook page, just like the one described by Falace and Galusha as being used in the robbery.

ARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
JITE 2E ~ PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

Defense counsel then could have pointed out that the Bennington Police received a report that Frank pointed a silver pistol at his sister just days before the robbery and the investigators did nothing to follow-up on that important lead. Counsel could have offered evidence about Frank Chinnici's special relationship with the BPD and the ATF, and that those investigators knew that Frank fit the physical description of the armed robber, that he spoke with a Brooklyn accent, that he was living in Bennington at the time of the robbery, and that he was engaged in illegal drug activities.

And finally, defense counsel could have shown the jury the Hemmings Motor News surveillance video that would have provided incontrovertible evidence that John Chinnici was not with Austin Mayhew when Mayhew left his apartment shortly after midnight to commit the robbery, Furthermore, the video would prove that Mayhew's story that he and John walked east on Main Street after leaving the apartment on their way to commit a robbery, that he walked back to his apartment after the robbery, and that he arrived before Vanessa returned in her car shortly before 1:00 a.m. was a complete fairy tale from beginning to end.

The evidence in this case demonstrates that in all likelihood an innocent man was arrested, tried, and convicted of a crime he did not commit. In the thirty-fours years I have been practicing criminal law I have never seen anything like this. A corrupt police agency, under pressure to solve a series of armed robberies and burglaries, that would fabricate a case against a person who they didn't want living in their community. To officers in that department, John Chinnici was a convenient target, a person who was

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

already on their "radar" and who they referred to as "the Mexican,"[34] "the freak,"[35] and a "turd-knocker" who they did not want "on the streets,"[36] someone who was "gonna go to jail. I'm telling you, he's gonna go to jail."[37] Why else would a veteran BPD detective be showing photos of John Chinnici to Anthony Falace before he had any real evidence that John Chinnici had committed the crime?

A prosecutor's office that ignored all of the obvious warning signs[38] and enabled BPD's conduct by withholding crucial evidence[39], instructing a police officer not to put information related the disappearance of critical evidence into writing[40], eliciting critical testimony it knew or should have known was not true[41], and providing vague, incomplete explanations about the disappearance of critical evidence[42], most recently on June 5, 2019[43], all in violation of Defendant's constitutional right to due process of law.

---

[34] *Ex. 5, p. 13.*

[35] *Ex. 21, p. 6.*

[36] *Ex. 21, p. 5.*

[37] *Ex. 21, p. 5.*

[38] For example, BPD's failure to honor Austin Mayhew's and Vanessa Garcia's invocation of their *Miranda* rights, BPD's premature arrest of John Chinnici to encourage Mayhew to name John as his accomplice, Det. Cole's misleading application to search John Chinnici's cell phone, shifting explanations for the "loss" of John Chinnici's cell phone and no credible explanation for the "loss" of the Mayhew and Garcia cell phones.

[39] *See Appendix B.*

[40] *Ex. 59.*

[41] *Ex. 43* (Hemmings Motor News surveillance video, 1/11/16, midnight to 1 a.m.) and *Ex. 54* (Det. Cole's notes taken while watching that video).

[42] *Ex. 60.*

[43] *Ex. 100(a).*

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
SUITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

And finally, an experienced member of this District's CJA Panel appointed to represent John Chinnici who did not thoroughly review the discovery available to him, prepare or file motions to suppress evidence based on police misconduct, investigate the disappearance of critical evidence, follow obvious leads that Frank Chinnici was Mayhew's accomplice, challenge an illegal photographic show-up, subpoena cell phone call records, point out at trial that his client did not fit the physical description of the gunman or have that person's Brooklyn accent, and show the jury a video recording that proved that his client wasn't with Mayhew as Mayhew left his apartment to commit the robbery.

That any of this could have happened is unacceptable; that it all happened in one case is a tragedy that can only be remedied by the Court vacating the jury's verdict, ordering a new trial, and giving John Chinnici a real opportunity to defend himself. *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984); *Napue v. Illinois,* 360 U.S. 264 (1959).

## CONCLUSION

Because Defendant was denied effective assistance of counsel, because the newly discovered evidence suggests that he did not commit the robbery, and because a prosecutor elicited critical testimony she knew or should have known was false, the Court should grant this motion, set aside the verdict, and order a new trial.

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E - PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411

DATED at Burlington, Vermont, this 19th day of June, 2019.


JOHN CHINNICI

By:  /s/David J. Williams
David J. Williams, Esq.
Jarvis, McArthur & Williams
P.O. Box 902
Burlington, VT 05402
(802) 658-9411
(802) 658-3551 (Fax)
dwilliams@jarvismcarthur.com

JARVIS, McARTHUR
& WILLIAMS
ATTORNEYS AT LAW
UITE 2E – PARK PLAZA
95 ST. PAUL STREET
P. O. BOX 902
BURLINGTON, VT
05402-0902
802-658-9411