U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2019 DEC 19 PM 3: 32

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA,            )
                                     )
          v.                         )          Case No. 2:17-cr-00077
                                     )
JOHN CHINNICI,                       )
                                     )
          Defendant.                 )

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR A NEW TRIAL
(Doc. 96)

On July 27, 2018, a jury found Defendant John Chinnici guilty of obstructing commerce by robbery in violation of 18 U.S.C. § 1951. Pending before the court is Defendant's December 21, 2018 motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. (Doc. 96.) Defendant filed a supplemental memorandum on June 19, 2019, and the government opposed Defendant's motion on September 6, 2019. Defendant filed an additional memorandum on October 3, 2019 and replied to the government's opposition on October 4, 2019. The court held an evidentiary hearing on October 15, 2019, after which it took the motion under advisement.

Defendant is represented by David J. Williams, Esq. The United States is represented by Assistant United States Attorneys Barbara A. Masterson and Joseph R. Perella.

## I.    The Evidence at Trial.

Shortly after midnight on January 11, 2016 in Bennington, Vermont, Martin's Mini Mart ("Martin's") employees Anthony Falace and Scott Galusha were on their way to deposit approximately $1,700 of store funds when they were approached by two masked men in the parking lot of Citizen's Bank. One of the men was carrying a silver handgun, and demanded that the Martin's employees drop the bag containing the deposit. Mr. Falace and Mr. Galusha complied and the unarmed robber grabbed the bag.

Mr. Falace observed that the robbers wore dark-colored hooded sweatshirts and their faces were covered. The armed robber's voice reminded Mr. Falace of a man he had encountered at Martin's who had a face tattoo, but he advised law enforcement that he did not know the man's name. Mr. Falace further recalled that the armed robber was heavy-set, while the other robber was slim. Mr. Falace testified that after the robbery, he reviewed Facebook photographs of individuals with face tattoos,[1] but he was not able to identify either of the robbers.

Mr. Galusha estimated that the armed robber was approximately five feet nine inches tall and weighed 190 pounds, and that the other robber was approximately five feet seven inches tall and 160 pounds. The robbery itself consisted of a very brief encounter between perpetrators and victims, and Mr. Galusha said he did not focus on the robbers because his eyes were on the gun. He recalled that the armed robber had a New York accent. A Martin's surveillance video shows two unidentified men running away from the area of Citizen's Bank shortly after Mr. Galusha and Mr. Falace left the store to make the deposit. The video then depicts the employees walking back to the store, where they called the police, a few minutes later.

Austin Mayhew testified at trial pursuant to a grant of judicial immunity providing that his statements would not be used to prosecute him for the Martin's robbery. He claimed that on January 10, 2016, he went to dinner in West Dover, Vermont with his girlfriend, Vanessa Garcia, and Defendant. After dinner, Ms. Garcia drove Defendant and Mr. Mayhew back to Bennington, and all three of them returned to Mr. Mayhew and Ms. Garcia's apartment. Mr. Mayhew testified that shortly after they arrived in

---

[1] The circumstances under which Mr. Falace viewed the Facebook photographs are unclear. At trial, Mr. Falace testified that Bennington Police officers showed him photographs, but the officers maintain they did not. Mr. Falace subsequently gave a statement to a defense investigator in which he maintained that he was shown photographs on a computer, but acknowledged that he was probably looking at his cell phone during the police interview. Mr. Falace also stated that he assumed the photographs he saw were from Facebook but he was not certain of their source.

Bennington, Defendant offered to forgive a $450 drug debt[2] if Mr. Mayhew helped him commit a robbery that night. Defendant and Mr. Mayhew dressed in dark clothing, covered their faces, and left the apartment in search of a business to target. Mr. Mayhew stated that Defendant carried a silver semi-automatic handgun with him.

Martin's was the first open business Defendant and Mr. Mayhew encountered, so they decided to rob it. Inside the store, Mr. Mayhew recognized his sister's boyfriend, Mr. Galusha, and Mr. Falace, whom he knew from visiting the store. Mr. Mayhew persuaded Defendant not to commit the robbery at Martin's because he did not want anyone to get hurt. Instead, Defendant and Mr. Mayhew decided to rob the employees in the drive-through lane at Citizen's Bank when they made the night deposit. Mr. Mayhew did not explain how he and Defendant knew when and where the night deposit would be made. Once they had seized the Martin's deposit, Mr. Mayhew testified that he and Defendant ran from the scene. A video was shown to the jury which showed two men running from the Citizen's Bank. After they split up the night deposit, Mr. Mayhew returned to his apartment alone and, finding himself locked out, crawled in through a window.

On January 14, 2016, Bennington Police Department ("BPD") officers executed a search warrant at Mr. Mayhew and Ms. Garcia's residence and seized three cell phones which were subsequently lost or misplaced by the BPD prior to trial. After the trial, two of those phones were discovered in a desk at the BPD. During an interview following the search, Mr. Mayhew admitted to committing the robbery, and, after some hesitation, identified Defendant as the person with the handgun.

BPD Detective Sergeant Lawrence Cole testified that he spoke with Defendant about the robbery three times on January 14, 2016. In the first recorded interview, which took place at Defendant's parents' residence at approximately 11:30 a.m., Defendant initially denied that he was with Mr. Mayhew and Ms. Garcia on the night of the robbery, but later admitted that he had dinner with them. Defendant was arrested that same day

---

[2] Defense counsel did not object to this testimony or seek a curative instruction regarding it although the court raised it as a concern *sua sponte*.

and interviewed again at approximately 6:30 p.m. after waiving his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). In the second recorded interview, Defendant asserted that Robert and Trisha Farkas would corroborate that he stayed at their home in Dover, Vermont on the night of January 10, 2016. He stated that he suffered a panic attack while at the Farkas residence which prompted him to walk to Wilmington, Vermont and catch a 6:55 a.m. bus back to Bennington on January 11, 2016. Detective Cole subsequently reviewed the video from the bus that Defendant claimed to have taken from Wilmington to Bennington on the morning of January 11, 2016, and did not see Defendant on board. During the interview, Defendant also suggested that Mr. Galusha might have committed the robbery with Mr. Mayhew to which BPD officers replied that Mr. Galusha was one of the victims.

Defendant spoke with Detective Cole a third time on January 14, 2016 and asked to use his cell phone to access additional evidence to prove that he was not involved in the Martin's robbery. Defendant's father brought the cell phone to the police station and provided it to Detective Cole, who gave it to Defendant, and then retrieved it because he was concerned Defendant would delete information from it. Detective Cole obtained a search warrant for the cell phone. Thereafter, BPD Detective Anthony Silvestro extracted the cell phone's data using Cellebrite software. Defendant's cell phone was also lost or misplaced by the BPD prior to trial and has not been recovered.

Frank Thornton, an expert in digital forensics, testified on behalf of the government regarding the reliability of a Cellebrite extraction and explained location data obtained from AT&T which showed that Defendant's cell phone traveled from Bennington to the Dover area and then back to Bennington on the evening of January 10, 2016. The phone remained in use in Bennington until approximately 9:42 a.m. on January 11, 2016.

Trisha Farkas testified that Defendant stayed at her house on the night of January 7, 2016 and authenticated a Facebook message sent by Defendant on January 8, 2016 wherein he explained that he had left early in the morning due to a panic attack and returned to Bennington by bus. Ms. Farkas confirmed that Defendant, Mr. Mayhew, and

4

Ms. Garcia had dinner in Dover on January 10, 2016 and left thereafter. She also confirmed that Defendant did not stay at her home that night. On January 14, 2016 at 12:07 p.m. Defendant sent Ms. Farkas a Facebook message informing her that Mr. Mayhew and Ms. Garcia had asserted they were with Defendant "on a certain night when [he] stayed at the pizzeria," but he contended that "they left and [he] stayed at [Ms. Farkas's] house[.]" (Doc. 148-3.)

Detective Silvestro testified that, like Detective Cole, he viewed the video from the bus Defendant claimed to have taken from Wilmington to Bennington on January 11, 2016 and did not see Defendant. A screenshot from the video was shown to the jury to corroborate that claim. Detective Silvestro further testified about using Cellebrite to extract data from Defendant's cell phone, and about the contents of the extracted data. Those contents included internet history showing that Defendant had checked the bus schedule while he was being interviewed at his parents' home on January 14, 2016, and had viewed a news article about three recent local robberies, including the Martin's robbery. The cell phone's call log revealed calls to and from Robert and Trisha Farkas and calls and text messages to and from Stephanie Dockery, Defendant's then-girlfriend, on January 10 and 11, 2016.

On the evening of January 10, 2016 at 9:20 p.m. Defendant told Ms. Dockery in a text message that he was returning to Bennington and meeting a friend at midnight. At 11:58 p.m., Defendant texted Ms. Dockery that he had to go immediately. Ms. Dockery and Defendant resumed text messaging at 12:37 a.m. on January 11, 2016 when Ms. Dockery texted that she was worried, and at 12:44 a.m. Defendant responded that he was "back safe and sound[.]" (Doc 148-4 at 9.) At 7:17 a.m., Defendant texted Ms. Dockery and wrote in part, "I only got a bullshit 836 last night. I'm gonna send you 500. Can I do it through Walmart so that way it's cheaper?" *Id.* at 10. Photographs extracted from Defendant's cell phone show that he transferred $960 to Ms. Dockery in two installments between January 11, 2016 and January 13, 2016.

## II. Procedural History.

Defendant was indicted by a grand jury on August 10, 2017, and Ernest M. Allen, III, Esq. was appointed to represent him. On June 20, 2018, the government moved for a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982) to investigate potential conflicts of interest between Attorney Allen and two potential trial witnesses. One of the witnesses at issue was Mr. Galusha, who was represented by Attorney Allen in a 1993 prosecution for bank robbery for which he sustained a federal felony conviction.

The court held a *Curcio* hearing on July 12, 2018. At the hearing, Defendant represented that he waived any conflict of interest resulting from Attorney Allen's previous representation of Mr. Galusha. When the court asked Defendant "[D]o you understand that there may be some hesitation for an attorney to vigorously cross examine, and, for example, show the person is a liar if it's a former client of theirs?" he responded "I do, but honestly not in this case." (Doc. 82 at 23:10-15.) Defendant also declined to consult with another attorney about the potential conflict.

The court discussed the conflict with Attorney Allen, including asking: "[W]hat if Mr. Galusha is cross examined about the issue that he has a prior robbery of his own and may have fabricated this?" *Id.* at 25:14-16. Attorney Allen responded, "I don't think I would be able to get it in" and stated, "if you think it's a good strategy, your Honor, we will consider it, but I'm thinking it's a loser." *Id.* at 25:17-22. Attorney Allen further confirmed that any harm from the conflict of interest had already been incurred because he had interviewed Mr. Galusha in preparation for Defendant's trial.

At the court's request, Defendant filed a signed waiver of the potential conflict on July 17, 2018. Mr. Galusha also filed a signed statement waiving any potential conflict of interest that could arise from being cross-examined by his former attorney.

A jury trial was held from July 24 to July 27, 2018 at which Defendant's primary defense was a challenge to his identity as one of the masked robbers. Only Mr. Mayhew unequivocally testified that Defendant was the armed robber. In his questioning of Mr. Galusha, Attorney Allen elicited that at the time of the robbery (and at the time of trial)

6

he was dating Mr. Mayhew's sister. Attorney Allen also asked Mr. Galusha if he called Mr. Mayhew on the morning after the robbery, but Mr. Galusha denied doing so and Mr. Allen did not pursue the issue further. In his closing argument, Attorney Allen reminded the jury of the connection between Mr. Galusha and Mr. Mayhew's sister and suggested that the robbery was an inside job, describing it as "an armed robbery that had some planning to it, knew where the night deposit was, knew what time they closed up, knew where they'd be going off a little inside information." (Doc. 87 at 74:20-23.) The jury found Defendant guilty of the robbery.

On August 14, 2018, Attorney Allen filed a motion to withdraw because Defendant intended to pursue a claim for ineffective assistance of counsel. The court granted the motion to withdraw on August 21, 2018, and on that date Attorney Williams was substituted as Defendant's counsel.

## III. Evidence Presented at the October 15, 2019 Evidentiary Hearing.

The court held an evidentiary hearing on Defendant's motion for a new trial on October 15, 2019. At the hearing, Attorney Allen testified about his previous representation of Mr. Galusha, his recollection of his interview with Mr. Galusha in connection with Defendant's case, and his subsequent discussion with Defendant about the potential conflict of interest. He also discussed his strategic decisions regarding the investigation and presentation of Defendant's case.

Attorney Williams called Martin's owner, David Dupee, to testify about a burglary of Martin's on November 19, 2015 in which a locker in a storage shed was breached by force and the money stored inside was stolen. Mr. Dupee opined that a burglar would not have been able to locate those funds without inside information. Mr. Dupee testified that he hired Mr. Galusha in 2015 shortly before the burglary occurred and that he does not trust him.

Defendant's mother, Cynthia Chinnici, testified that, prior to trial she communicated with Attorney Allen about her belief that Frank Chinnici, Defendant's uncle, was involved in the robbery. Attorney Williams introduced evidence that Frank

Chinnici more closely resembled the description of the armed robber, had a criminal record, and lived with Ms. Garcia after the robbery.

Mrs. Chinnici also provided Attorney Allen with contact information for Ashley Raleigh, a family acquaintance who claimed she had been messaging with Defendant at the time of the robbery. She further described the circumstances in which Trisha Farkas had retracted her initial statement that Defendant was at her house on the night of the robbery and declined to make a second statement supporting Defendant's alibi.

Ms. Raleigh testified at the hearing, recalling that she communicated with Defendant on Facebook messenger shortly before midnight on the night of the robbery but had purged her cell phone of those messages. She informed Defendant's mother that she was messaging Defendant at the time of the robbery, but she did not contact Defendant's counsel directly.

Ms. Garcia testified that after returning from Dover to Bennington on the night of January 10, 2016, she drove to Taco Bell and then went home, where she remained for the rest of the evening. Attorney Williams cited her testimony as evidence that Mr. Mayhew's trial version of the events surrounding the robbery was false.

Detective Cole testified about a conversation he had with Donna Chinnici after the Martin's robbery in which she reported that Frank Chinnici threatened her with a silver handgun. Detective Cole explained that he did not follow up on this report because the alleged threat occurred in New Jersey.

Mr. Mayhew testified that he committed the November 19, 2015 burglary of Martin's, and that he did not have inside information about where the money was stored but had a general idea of where to look based on his observation of store employees. With regard to the January 11, 2016 Martin's robbery, Mr. Mayhew explained the route he and Defendant took when they left his apartment and headed toward the store, and how they purposely did not pass in front of the security cameras at the Hemmings Motor News next door so as to avoid detection.

Attorney Williams provided evidence that a phone number associated with Mr. Galusha placed numerous calls to a phone number associated with Mr. Mayhew on the

8

morning after the robbery. Mr. Mayhew testified that the phone calls were likely from his father, who lived in the same building as Mr. Galusha.

Mr. Galusha testified and reaffirmed that he did not speak to Mr. Mayhew on the morning of January 11, 2016 after the robbery and that the calls he was alleged to have made to Mr. Mayhew were from a phone number used by Mr. Mayhew's father. He claimed he did not own a cell phone at the time of the Martin's robbery.

At the hearing, the defense offered affidavits from Austin Mayhew's sister and father, Joslin and Bruce Mayhew, stating that they did not call Austin Mayhew on the morning of January 11, 2016 using the phone located in Bruce Mayhew's home. On October 31, 2019, the government submitted rebuttal affidavits from Joslin and Bruce Mayhew, stating that they did not recall calling Mr. Mayhew from that landline phone on the morning in question.

In his testimony, Defendant disputed that he instructed Attorney Allen not to pursue the theory that Frank Chinnici may have committed the robbery. In addition, Defendant testified that he would not have waived his right to conflict-free counsel had he understood that Attorney Allen would not implicate Mr. Galusha in the robbery because Defendant believed Mr. Galusha was likely involved as an insider. Defendant further described overhearing a phone conversation when he was with Mr. Mayhew on the morning after the Martin's robbery, and stated that after the call Mr. Mayhew told him he was talking to Mr. Galusha and that he was holding onto Mr. Galusha's share of the money from "something" Mr. Galusha and Mr. Mayhew had done together. (Doc. 182 at 187:13.)

Mr. Thornton provided expert testimony for the government regarding how cell phones interact with cellular networks when they are turned on, in airplane mode, or powered off. Mr. Thornton examined the two phones seized during the search of the Mayhew-Garcia apartment in January 2016 which were lost prior to trial but discovered thereafter, as well as call detail records for the cell phone numbers belonging to Mr. Mayhew and Ms. Garcia. He testified that the call detail records showed incoming phone calls that were received after the phones had been seized and were automatically sent to

9

voicemail. Mr. Thornton also performed a manual review of the two phones and found that they showed no outgoing activity after January 12, 2016 and January 13, 2016, respectively.

## IV. Conclusions of Law and Analysis.

Federal Rule of Criminal Procedure 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Ultimately, the court must determine "whether letting a guilty verdict stand would be a manifest injustice." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013), *cert. denied*, 135 S. Ct. 400 (2014).

> [Rule 33] by its terms gives the trial court broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice. The district court must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurping the role of the jury. Because the courts generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility, it is only where exceptional circumstances are demonstrated that the trial judge may intrude upon the jury function of credibility assessment. An example of exceptional circumstances is where testimony is patently incredible or defies physical realities, although the district court's rejection of trial testimony by itself does not automatically permit Rule 33 relief.

> The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict. The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. There must be a real concern that an innocent person may have been convicted. Generally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, but it nonetheless must exercise the Rule 33 authority sparingly and in the most extraordinary circumstances.

*United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001) (alterations, internal quotation marks, and citations omitted). "While one kind of manifest injustice that courts might confront is a real concern that an innocent person may have been convicted, it is surely not the only kind." *United States v. Sakoc*, 115 F. Supp. 3d 475, 488 (D. Vt. 2015) (Sessions, J.) (internal quotation marks and citation omitted) (granting motion for new

trial based on manifest injustice where prosecution advanced a new theory of the case in closing argument that was unknown to defendant throughout trial).

In his initial motion, Defendant asserts that he is entitled to a new trial for two reasons: first, he claims that Attorney Allen failed to provide effective assistance of counsel both before and during trial; and second, he argues that he has identified newly discovered evidence that would have supported a judgment of acquittal at trial. In his supplemental memorandum, Defendant adds a claim for a new trial based on prosecutorial misconduct.

## A. Whether Defendant is Entitled to a New Trial Based on Newly Discovered Evidence.

Defendant alleges that new evidence not available to him at trial would have supported a judgment of acquittal. The purportedly new evidence includes: (1) a criminal record check containing a physical description of Frank Chinnici; (2) an image of a handgun posted on Facebook by Frank Chinnici; (3) the fact that Frank Chinnici allegedly has a "special relationship" with not only state and federal investigators (Doc. 96 at 2) but also came to live with Ms. Garcia after the Martin's robbery; and (4) an extended version of the surveillance video from Hemmings Motor News, which Defendant asserts conflicts with Mr. Mayhew's trial testimony.

The government contends that information about Frank Chinnici's appearance and the contents of his Facebook page were available before trial and thus are not "newly discovered." It argues that evidence of a "special relationship" between Frank Chinnici and government investigators is not material because any such relationship commenced after the robbery and is irrelevant to Defendant's innocence or guilt. With regard to the extended surveillance video from Hemmings Motor News, the government notes that the full-length version was available to defense counsel prior to trial, that it constitutes impeachment evidence at most, and that the video, itself, is not exculpatory.

A defendant asserting entitlement to a new trial on the basis of newly discovered evidence must show:

(1) the evidence was newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in acquittal.

*United States v. Forbes*, 790 F.3d 403, 406-07 (2d Cir. 2015) (internal brackets and citation omitted).

"Because motions for a new trial are disfavored in this Circuit the standard for granting such a motion is strict; that is, newly discovered evidence must be of a sort that could, if believed, change the verdict." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). A motion for a new trial based on newly discovered evidence "will only be granted when the new evidence would probably lead to an acquittal." *United States v. Spencer*, 4 F.3d 115, 118 (2d Cir. 1993) (internal alteration, quotation marks and citation omitted).

Some of the evidence that Defendant contends was "newly discovered" after trial was, in fact, available before trial. Information about Frank Chinnici's physical appearance was known to Defendant prior to trial and information from Frank Chinnici's publicly available Facebook page could have been obtained prior to trial through an exercise of due diligence. Other evidence, including information concerning Frank Chinnici's alleged relationship with the BPD and federal investigators, is not material to Defendant's innocence or guilt. The extended Hemmings Motor News video is also not material because, at most, it provides an indirect challenge to the truthfulness of certain aspects of Mr. Mayhew's trial testimony, primarily how he and Defendant left the apartment prior to the robbery. *See United States v. Damblu*, 134 F.3d 490, 494 (2d Cir. 1998) ("Nondisclosure of cumulative evidence tending only to further impeach a witness' general credibility is not grounds for granting a Rule 33 motion.") (citation omitted). None of the evidence cited by Defendant "would probably lead to an acquittal" had it been adduced at trial. *United States v. McCarthy*, 54 F.3d 51, 55 (2d Cir. 1995) (citation omitted). Because the evidence that Defendant characterizes as newly discovered does

12

not satisfy the strict standards for a new trial, Defendant's motion for a new trial on this basis is DENIED.

## B. Whether Defendant is Entitled to a New Trial Based on Ineffective Assistance of Counsel.

In his motion for a new trial and supplemental memorandum, Defendant asserts that Attorney Allen failed to provide him with effective assistance of counsel based on the following acts and omissions:

- Not challenging Defendant's arrest as unlawful due to a lack of probable cause;
- Not seeking a hearing to challenge the validity of search warrants issued for Defendant's phone;
- Not filing a motion *in limine* to exclude data from Defendant's cell phone after the BPD lost the cell phone prior to trial;
- Not filing a motion *in limine* to exclude evidence in light of the BPD's loss of the cell phones seized from the Mayhew-Garcia apartment prior to trial;
- Not requesting a mistrial when Mr. Falace raised the possibility that an impermissibly suggestive pretrial photograph identification of Defendant had occurred;
- Not developing exculpatory evidence at trial, including failing to show that BPD officers "improperly targeted and may have framed Defendant" (Doc. 96 at 1);
- Not emphasizing discrepancies between eyewitness descriptions of the perpetrators and Defendant's appearance;
- Not pursuing the theory that Defendant's relative, Frank Chinnici, may have committed the robbery; and
- Not pursuing the theory that Mr. Galusha may have conspired with Mr. Mayhew in planning and executing the robbery.

The government argues that Defendant's ineffective assistance of counsel claim fails both the performance and prejudice prongs of the test established in *Strickland v. Washington*, 466 U.S. 668 (1984) because Attorney Allen made reasonable strategic decisions in providing Defendant a competent defense and because Defendant cannot establish his actual innocence.

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. To demonstrate that he received ineffective assistance of counsel in violation of the Sixth Amendment, Defendant must satisfy both prongs of the *Strickland* test. The first prong requires Defendant to demonstrate that Attorney Allen's performance "fell below an objective standard of reasonableness[,]" meaning it was "so deficient that it falls outside the 'wide range of professionally competent assistance.'" *Kovacs v. United States*, 744 F.3d 44, 50 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 690). The inquiry focuses on "whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo v. Moore*, 562 U.S. 115, 122 (2011) (quoting *Strickland*, 466 U.S. at 690). "'[S]trategic choices made after thorough investigation . . . are virtually unchallengeable,' and even strategic choices made after less than complete investigation do not amount to ineffective assistance—so long as the known facts made it reasonable to believe that further investigation was unnecessary." *Henry v. Poole*, 409 F.3d 48, 63 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690-91).

The second prong of the *Strickland* test requires Defendant to show actual prejudice such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kovacs*, 744 F.3d at 51 (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome, and thus the chance of an alternate result must be substantial, not just conceivable[.]" *Waiters v. Lee*, 857 F.3d 466, 480 (2d Cir. 2017) (internal quotation marks and citations omitted). An ineffective assistance of counsel claim "must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." *Bennett v. United States*, 663 F.3d 71, 85 (2d Cir. 2011).

Defendant cannot satisfy the prejudice prong of the *Strickland* test for all but one of his ineffective assistance of counsel claims. Even if Attorney Allen had pursued the

14

defense in the manner suggested by Attorney Williams, the court cannot find that there is a substantial, reasonable probability that the outcome would be different. None of these alleged deficiencies in Attorney Allen's performance would address the primary evidence of Defendant's guilt which consisted of Austin Mayhew's testimony that he had committed the robbery with Defendant.[3] The court thus DENIES Defendant's motion for a new trial on the basis of ineffective assistance of counsel under *Strickland* insofar as it is based on the investigation and trial decisions he has identified as problematic.

## C.     Whether Defendant is Entitled to a New Trial Because of an Actual Conflict of Interest.

The right to effective assistance of counsel encompasses "the right to select and be represented by one's preferred attorney[.]" *Wheat v. United States*, 486 U.S. 153, 159 (1988). Notwithstanding this right, "the essential aim of the [Sixth] Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Id.* Given the paramount importance of ensuring effective advocacy,

although a criminal defendant can waive [his] Sixth Amendment rights in some circumstances, that right to waiver is not absolute, since "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them."

*United States v. Locascio*, 6 F.3d 924, 931 (2d Cir. 1993) (second alteration in original) (quoting *Wheat*, 486 U.S. at 160). The "authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process." *United States v. Prevezon Holdings Ltd.*, 839 F.3d 227, 241 (2d Cir. 2016) (citation omitted).

"The right to the effective assistance of counsel also includes the right to be represented by an attorney who is free from conflicts of interest." *United States v. Perez*, 325 F.3d 115, 125 (2d Cir. 2003). Two types of conflicts may infringe on a defendant's

---

[3] Although Defendant's text messages presented additional evidence of guilt, Defendant contends that Attorney Allen should have sought suppression of that evidence when the BPD lost Defendant's cell phone.

right to counsel: "(1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." *United States v. Levy*, 25 F.3d 146, 152 (2d Cir. 1994). An actual conflict occurs when "during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *United States v. Arrington*, 941 F.3d 24, 40 (2d Cir. 2019) (quoting *United States v. Schwarz*, 283 F.3d 76, 91 (2d Cir. 2002)). "While a defendant is required to demonstrate prejudice to prevail on most claims of ineffective assistance of counsel . . . the same showing is not necessary when a defendant's counsel is burdened by an actual conflict of interest because, under such circumstances, prejudice is usually presumed." *United States v. Feyrer*, 333 F.3d 110, 116 (2d Cir. 2003) (citing *Strickland*, 466 U.S. at 687).

A defendant raising a claim of ineffective assistance of counsel based on an actual conflict of interest must demonstrate that "counsel actively represented conflicting interests," and that "such conflict adversely affected his lawyer's performance." *Id.* (citing *Strickland*, 466 U.S. at 692). To show an adverse effect, the defendant must identify "some plausible alternative defense strategy or tactic [that] might have been pursued" and was "inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Schwarz*, 283 F.3d at 92 (internal quotation marks omitted) (citing *Levy*, 25 F.3d at 157). "The foregone strategy or tactic is not even subject to a requirement of reasonableness[,]" *id.*, and "[t]he test is a strict one because a defendant has a right to an attorney who can make strategic and tactical choices free from any conflict of interest." *United States v. Williams*, 372 F.3d 96, 106 (2d Cir. 2004) (citation omitted).

In *Curcio*, the Second Circuit established a procedure to assess an attorney's conflict of interest and permit a defendant to waive his right to conflict-free counsel. Where a defendant expresses the desire to make such a waiver, the trial court must:

(1) advise the defendant of his right to conflict-free representation,
(2) instruct the defendant as to the dangers arising from the particular conflict, (3) permit the defendant to confer with his chosen counsel,
(4) encourage the defendant to seek advice from independent counsel,

16

(5) allow a reasonable time for the defendant to make his decision, and
(6) determine, preferably by means of questions that are likely to be
answered in narrative form, whether the defendant understands the risks
and freely chooses to run them.

*United States v. Rodriguez*, 968 F.2d 130, 139 (2d Cir. 1992) (citing *Curcio*, 680 F.2d at
888-90). If the requirements of *Curcio* have been met and the defendant makes a
"knowing and intelligent" waiver of his right to conflict-free counsel, the court may
accept the waiver and allow the defendant to proceed with his chosen counsel. *Williams
v. Meachum*, 948 F.2d 863, 866 (2d Cir. 1991). A waiver is "knowing and intelligent
when a defendant shows that he is 'aware of and understands the various risks and
pitfalls'" of proceeding despite the potential conflict. *Id.* (quoting *Curcio*, 680 F.2d at
888).

In *United States v. Iorizzo*, the Second Circuit Court of Appeals considered a
claim of ineffective assistance of counsel in the context of defense counsel's previous
representation of a key government witness in a related proceeding. 786 F.2d 52, 54 (2d
Cir. 1986). The court found that counsel had an "unavoidable conflict of interest"
because the witness's "previous testimony under oath was clearly relevant to the
testimony he gave at trial[,]" but because those "prior statements had been made at a time
when defense counsel was representing him," defense counsel could not use them on
cross-examination. *Id.* at 57. The court further found that the conflict of interest "led
defense counsel to forego a most relevant line of inquiry" which would have called the
witness's credibility into question. *Id.*

Similarly, in *United States v. Levy* the Second Circuit held that an attorney's prior
representation of a codefendant, even if "fully terminated" prior to serving as counsel for
the defendant, constituted an actual conflict of interest because the attorney's "continuing
legal and ethical obligations to protect" the codefendant as a former client "necessarily
meant that [the attorney's] interests diverged from [the defendant's.]" 25 F.3d at 156.
The court observed that the conflict was particularly serious because the defendant's
"most likely defense was to shift blame" to his codefendant. *Id.* As the Court of Appeals
for the Tenth Circuit explained in *Church v. Sullivan*: "we find it difficult to envision

17

circumstances more fraught with inherent conflict than where an appointed attorney representing a reluctant defendant must present a defense theory inculpating the attorney's former client, particularly where the former representation was factually intertwined with the criminal defendant's case." 942 F.2d 1501, 1511 (10th Cir. 1991).

In this case, Attorney Allen had an actual conflict of interest, the magnitude of which was not apparent until the case went to trial and the true nature of the relationship between Mr. Mayhew and Mr. Galusha emerged. As the identity of the perpetrators of the armed robbery was the central issue at trial, Mr. Galusha's testimony and description of the robbers was critical not only on the issue of identification but also to support Mr. Mayhew's version of the events.

In the course of trial and in the evidence obtained thereafter, it became clear that Mr. Mayhew and Mr. Galusha's relationship was not attenuated but, rather, that they were both implicated in the November 2015 burglary of Martin's, had close familial ties, and appeared to have communicated numerous times the morning after the robbery which would be unusual if they were perpetrator and victim. Because Mr. Mayhew was testifying under a grant of immunity, only Defendant would suffer the consequences if the jury found Mr. Mayhew's testimony credible. Fully exposing the Galusha-Mayhew relationship may have enabled Attorney Allen to damage the credibility of Mr. Mayhew, the government's primary witness. If the jury discounted Mr. Galusha's testimony as an insider, they would be left with only Mr. Falace's vague description of the robber with the gun to find Defendant guilty beyond a reasonable doubt.

At the *Curcio* hearing, Attorney Allen discounted an "inside job" defense theory but ultimately pursued one, at least in part, in his closing argument. To support this theory at trial, he had an obligation to vigorously expose Mr. Galusha as a participant in the alleged crime, including seeking to introduce evidence of Mr. Galusha's alleged participation in the November 2015 Martin's burglary as proof of the same *modus operandi* that was used in the January 2016 Martin's robbery. This vigorous defense would have required Attorney Allen to expose Mr. Galusha's bias and motive to testify falsely. Establishing that Mr. Galusha was an inside source for Mr. Mayhew in both the

18

2015 Martin's burglary and the 2016 Martin's robbery would undercut Mr. Mayhew's description of how he and Defendant decided to commit the robbery. If Mr. Mayhew's testimony was rejected by the jury *in toto*, an acquittal would have been a significantly probable outcome. Attorney Allen was, of course, foreclosed from incriminating his former client by virtue of his ethical duty of loyalty. The court thus does not find that he acted wrongfully, only that there was an actual conflict of interest.

Although Defendant purported to waive Attorney Allen's conflict at the *Curcio* hearing and later filed a written waiver confirming that decision, and although this generally forecloses a later claim of ineffective assistance of counsel,[4] this does not hold true where waiver "was not knowing and intelligent with respect to the specific conflict that led to the lapse in [counsel's] representation." *Schwarz*, 283 F.3d at 95. "Whether a waiver is knowing and intelligent depends on the circumstances of each individual case as well as the background and experience of the accused." *United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998).

Courts have found that pre-trial conflict of interest waivers were not knowing and intelligent where the waiver "did not reach [a] conflict that was unforeseen and did not emerge until trial," *United States v. Newell*, 315 F.3d 510, 522 (5th Cir. 2002), and where it appeared that the defendant did not understand "the specific ramifications of his waiver[.]" *Lewis v. Mayle*, 391 F.3d 989, 996 (9th Cir. 2004) (citation omitted). In *Blau*, the Second Circuit found that the defendant had validly waived his objection to a potential conflict of interest after counsel explained to him the issues that could arise due to the attorney's previous representation of the recipient of the bribes that defendant was charged with paying. 159 F.3d at 75. The court based its determination that the defendant's waiver was knowing and intelligent on the retainer agreement he signed that

---

[4] The Second Circuit has recognized unwaivable or *per se* conflicts of interest "in two limited circumstances: where defendant's counsel was unlicensed, and when the attorney has engaged in the defendant's crimes." *United States v. Fulton*, 5 F.3d 605, 611 (2d Cir. 1993). Neither of those circumstances is present here.

19

referred to the potential conflict, and on the defendant's professional experience as an accountant with a law degree. *Id.*

Defendant has a GED and has never previously taken a case to trial. There is no evidence that he was advised of Attorney Allen's previous representation of Mr. Galusha when Attorney Allen was initially appointed as his counsel. It was the government, not defense counsel, that requested the *Curcio* hearing. At the *Curcio* hearing, Defendant clearly did not understand that Mr. Galusha was an adverse witness critical to the government's case and tied to the government's primary witness. (*See* Doc. 82 at 21:19-21) ("I don't have a conflict with that for the aspect of [Attorney Allen] is not representing somebody going against me."). Although the court inquired whether Defendant understood that the conflict could affect Attorney Allen's loyalty and approach to cross-examination, its inquiry was based on Attorney Allen's representation that he did not plan to pursue an "inside job" theory at trial.

The Court of Appeals for the Ninth Circuit's decision in *Lockhart v. Terhune*, 250 F.3d 1223 (9th Cir. 2001) is instructive. There, the Ninth Circuit found that the defendant did not make a knowing and intelligent waiver of his right to conflict-free counsel because he did not understand that his counsel would be unable to investigate or accuse his former client, who had also been implicated in the crime. *See id.* at 1233.

In this case, Defendant's waiver was not knowing and intelligent because he did not fully comprehend the ramifications the waiver would have on his defense or how Attorney Allen's cross-examination of Mr. Galusha could be used to undercut Mr. Mayhew's highly incriminating testimony at trial. *See Arrington*, 941 F.3d at 42 (holding waiver was not knowing and intelligent because the defendant was not "advised of the conflict's significant strategic consequences" and remanding for a new trial). If Mr. Mayhew was discounted by the jury as a truthful source of information regarding the crime, the government would have had scant evidence left on the pivotal issue of the identification. Mr. Falace's testimony, and any other evidence admitted, may have fallen well short of proof beyond a reasonable doubt. Because Defendant did not make a valid

waiver of his conflict-free counsel right, his motion for a new trial on that basis is GRANTED.

## D. Whether Defendant is Entitled to a New Trial Based on Prosecutorial Misconduct.

Defendant asserts that the prosecution committed misconduct by eliciting testimony from Mr. Mayhew at trial that it knew or should have known was false. Specifically, Defendant claims that the Hemmings Motor News surveillance video contradicts Mr. Mayhew's testimony regarding the events on the night of the robbery. Defendant further contends that the government improperly failed to disclose evidence regarding the cell phones seized from Defendant, Mr. Mayhew, and Ms. Garcia that could not be located at the time of trial, as well as a criminal record check for Frank Chinnici. The government counters that any undisclosed evidence was not material because it would not have led to a different outcome at trial. The government disputes Defendant's assertion that it knowingly elicited false testimony, maintaining that the video does not conclusively establish that Mr. Mayhew's testimony was perjured. To the extent that Mr. Mayhew gave false testimony about when and how he and Defendant planned, prepared for, and executed the robbery, the government argues that any such inaccuracy was immaterial to the jury's verdict.

To prevail on a motion for a new trial based on prosecutorial misconduct, a defendant must demonstrate that the claimed misconduct "resulted in substantial prejudice by so infecting the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Aquart*, 912 F.3d 1, 27 (2d Cir. 2018) (internal quotation marks and citation omitted). Where the claim of prosecutorial misconduct is based on an allegation that the government elicited perjured testimony, the defendant is entitled to a new trial "if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Fernandez v. Capra*, 916 F.3d 215, 230 (2d Cir. 2019) (citation omitted). "[I]f it is established that the government knowingly permitted the introduction of false testimony reversal is virtually automatic." *Id.* (internal quotation marks and citation omitted). A defendant seeking a new trial based on a claim that the

21

prosecution failed to disclose favorable evidence as required by *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and its progeny must demonstrate that the evidence was material such that "there is a reasonable probability that, had [it] been disclosed to the defense, the result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

Defendant's misconduct claim centers on the Hemmings Motor News surveillance video which he asserts the government failed to disclose in its entirety before trial and which he contends establishes that Mr. Mayhew gave false testimony regarding the route that he and Defendant travelled when they approached Martin's before committing the robbery. The full-length Hemmings video is inconclusive and does not support a conclusion that the government knowingly elicited perjured testimony at trial. In any event, Detective Cole's notes, which were produced in discovery, reflect that he reviewed multiple hours of security footage from Hemmings, and those notes alerted Defendant's trial counsel that the full-length video existed.

Although there is evidence that Mr. Mayhew may not have been truthful at trial, there is no factual or legal basis to find the government knowingly suborned his alleged perjury. Indeed, the court finds no evidence that the government acted in bad faith in any aspect of this case.

As for Defendant's allegation that the prosecution committed misconduct by not producing information regarding Frank Chinnici in discovery, there was no reason to produce this evidence based on Attorney Allen's defense theory and there is no "reasonable probability . . . that the outcome of a trial in which the evidence had been disclosed would have been different." *United States v. Coppa*, 267 F.3d 132, 142 (2d Cir. 2001). Because Defendant has failed to establish evidence of prosecutorial misconduct, his motion for a new trial on this basis is DENIED.

## CONCLUSION

For the foregoing reasons, Defendant's motion for a new trial is GRANTED because Defendant is entitled to a new trial based on his right to conflict-free counsel. SO ORDERED.

Dated at Burlington, in the District of Vermont, this 19th day of December, 2019.

Christina Reiss, District Judge
United States District Court